**CITIZENS FOR A BETTER EN- VIRONMENT–CALIFORNIA, et al., Plaintiffs,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant.**

**CITIZENS FOR A BETTER EN- VIRONMENT–CALIFORNIA, et al., Plaintiffs,**

v.

**EXXON COMPANY USA, Defendant.**

Nos. C 94–0712 TEH, C 94–0713 TEH.

United States District Court, N.D. California.

July 8, 1994.

---

Mari Mayeda, David E. Pesonen, Linda M. Dardarian, Saperstein, Mayeda & Goldstein, Oakland, CA, Nora J. Chorover, Citizens for a Better Environment, Michael R. Lozeau, San Francisco Baykeeper, San Francisco, CA, for plaintiffs.

Margaret N. Rosegay, Sarah G. Flanagan, Pillsbury, Madison & Sutro, San Francisco, CA, for defendant.

## MEMORANDUM OPINION AND ORDER

THELTON E. HENDERSON, Chief Judge.

The two above-captioned related cases are identical citizen suits brought by non-governmental environmental conservation organizations against defendant oil companies. The suits challenge each defendant's discharge into portions of the San Francisco Bay of waste water containing the chemical selenium from oil refineries owned by each defendant located in the San Francisco Bay area. The first suit is brought against defendant Union Oil Company of California ("Unocal") and concerns Unocal's refinery at Rodeo, California, which discharges waste water containing selenium into the San Pablo Bay. The second is against the Exxon Corporation ("Exxon") and concerns Exxon's refinery at Benicia, California, which discharges selenium into Suisan Bay. Plaintiffs allege that the selenium levels in the effluent discharged from Unocal and Exxon's refineries violate the federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251 et seq.

Defendants Unocal and Exxon have moved to dismiss the suits on several grounds. In addition, Exxon has moved that the suit against it be dismissed on the ground that venue over that case properly lies in the U.S. District Court for the Eastern District of California. Oral argument on these motions was heard by the Court on June 6, 1994. After consideration of the parties' written and oral arguments, the Court rules that

venue in the suit against Exxon, *Citizens for a Better Environment–California v. Exxon*, No. C 94–0713 TEH, indeed lies in the Eastern District and therefore ORDERS that the case be TRANSFERRED from this Court to the U.S. District Court for the Eastern District of California. As for the suit against Unocal, the Court DENIES Unocal's motion to dismiss. The reasons for these rulings are set forth in the memorandum opinion and order that follows.

## I. BACKGROUND

In these two actions brought pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, the plaintiff environmental groups seek to enforce effluent discharge standards and deadlines contained in certain pollution permits issued to defendants Unocal and Exxon pursuant to the Clean Water Act. These suits are undertaken in the face of an administrative order, issued by a state agency charged with enforcing the Clean Water Act, which purports to grant defendants a five-year extension of the deadline by which they must come into compliance with the pollution discharge standards contained in their permits. The issue central to these motions is what effect the state administrative order has on the enforceability of the standards contained in defendants' pollution permits.

## A. THE REGULATORY FRAME–WORK

The Clean Water Act regulates the discharge of pollutants into navigable waters. The statute is structured such that all discharge of pollutants is prohibited except insofar as one of several enumerated statutory exceptions applies. *See* 33 U.S.C. § 1311(a). One such exception obtains where a polluter has been issued a permit pursuant to the National Pollution Discharge Elimination System ("NPDES permit" or "permit"), authorizing it to discharge designated pollutants at certain levels subject to certain conditions. *See* 33 U.S.C. § 1342. The effluent discharge standards or limitations specified in an NPDES permit define the scope of the authorized exception to the 33 U.S.C. § 1311(a) prohibition, such that violation of a permit limit places a polluter in violation of

33 U.S.C. § 1311(a). Private parties may bring citizen suits pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).

The Act provides that, in any given state or region, authority to administer the NPDES permitting system can be delegated by the federal Environmental Protection Agency ("EPA") to a state or regional regulatory agency, provided that the applicable state or regional regulatory scheme under which the local agency operates satisfies certain criteria. *See* 33 U.S.C. § 1342(b). In California, EPA has granted authorization to a state regulatory apparatus, comprised of the State Water Resources Control Board ("State Board") and several subsidiary Regional Water Quality Control Boards, to issue NPDES permits. The entity responsible for issuing NPDES permits and otherwise regulating discharges in the region at issue in these cases is the California Regional Water Quality Control Board, San Francisco Region ("Regional Board" or "Board").

## B. HISTORY OF UNOCAL AND EXXON'S NPDES PERMITS

Exercising its delegated authority under the Clean Water Act, the Regional Board in 1989 and 1990 issued NPDES permits for Unocal, Exxon, and four other Bay Area oil refineries, specifying certain limits on the amount of pollutants that the refineries could discharge into the San Francisco Bay and its estuary ("Bay"). Selenium, a toxic element, occurs in high concentrations in the relatively low grade crude oil from the San Joaquin Valley that is refined at the six Bay Area refineries. Selenium passes through the refineries and is present in the wastes that they discharge into the Bay.

The 1987 Amendments to the Clean Water Act required states to identify a list of navigable waters for which water quality standards established under the Act were unlikely to be achieved "due entirely or substantially to discharges from point sources of any toxic pollutants listed pursuant to [33 U.S.C. § 1317(a)]." 33 U.S.C. § 1314($l$)(1)(B). Selenium has been listed by EPA as a toxic

pollutant pursuant to this code section. *See* 40 C.F.R. § 401.15. As part of such listing, the state must identify the point sources causing selenium pollution in the listed waters and develop an "individual control strategy" ("ICS") to control each point source so as to achieve the water quality objectives for such waters "as soon as possible, but not later than 3 years after the date of the establishment of such strategy." 33 U.S.C. §§ 1314(*l*)(1)(C), (D).

On February 3, 1989, when the California Water Resources Control Board published its list required pursuant to the 1987 Clean Water Act Amendments, the State Board did not identify several portions of the upper San Francisco Bay Estuary—San Pablo Bay, Carquinez Strait, and Suisan Bay—as "toxic hot spots" for selenium, nor did it specify oil refinery selenium discharges as a substantial cause of selenium pollution in the Bay. EPA took issue with these omissions, among other things. Exercising its regulatory authority under the Clean Water Act, EPA issued a final listing on September 28, 1990, designating these portions of the Bay as "impaired waters" due to selenium pollution, and attributing that selenium substantially to the discharges from the six Bay Area refineries: Unocal's refinery in Rodeo, Exxon's refinery in Benicia, Shell Oil Company's manufacturing complex in Martinez, Tosco Corporation's refinery in Avon, Chevron U.S.A.'s refinery in Richmond, and Pacific Refining Company's facility in Hercules. EPA stated that it disapproved of the ICS's then in effect for Unocal, Exxon, and the other dischargers, and made known its intention to issue its own ICS's not later than December 31, 1990, which would require compliance with specified effluent limits, calculated based on state water quality standards, within three years of the date of issuance.

Responding to EPA's rebuke, on February 20, 1991, the Board issued an order listing San Pablo Bay, Carquinez Strait, and Suisan Bay as "hot spots" under 33 U.S.C. § 1314(*l*), and amending Unocal, Exxon, and the other refineries' NPDES permits to specify certain concentration- and mass-based limits on the amount of selenium that each refinery could discharge. By the terms of

the amended permits, these new limits ("final limits") would become effective on December 12, 1993. On June 16, 1991, the Board issued an additional order, amending the permits of Unocal, Exxon, and the other refineries to include interim selenium discharge limits ("interim limits"), significantly less stringent than the final limits. The interim limits went into effect immediately on that date and were to remain in force until the final limits took effect.

## C. STATE COURT LAWSUIT BY REFINERIES

Unocal, Exxon, and the other Bay Area refineries sought unsuccessfully to challenge the Regional Board's listing of San Pablo Bay, Carquinez Strait, and Suisan Bay as impaired waters, each filing applications for review with the State Water Resources Control Board. On October 16, 1992, shortly after those applications were dismissed by the State Board, the Bay Area refineries and their trade association, the Western States Petroleum Association ("WSPA"), filed a petition for writ of mandate in Solano County Superior Court seeking to set aside the Regional Board's orders imposing the final limits and the interim limits on the ground that the listing of the above-noted regions of the Bay as impaired bodies of water was in violation of various provisions of the Clean Water Act and of EPA administrative regulations promulgated under the Act.

## D. SETTLEMENT OF LAWSUIT AND REGIONAL BOARD ENFORCEMENT ACTION

The refineries and WSPA did not press for a hearing on the merits of their state court suit but instead initiated settlement negotiations with the Regional Board and the California Attorney General's Office, which proceeded over the course of 1993. Three of the Bay Area refineries, Chevron, Tosco, and Pacific Refining, reduced their discharge levels, such that they would be in compliance with the final limits when they took effect. Unocal, Exxon, and Shell, however, contended that they could not comply with the final limits. Although the other three refineries had succeeded in reducing their effluent lev-

els to meet the final limits, Unocal, Exxon, and Shell maintained that, due to technological constraints, they could not reduce their selenium discharge levels sufficiently to comply with the final limits scheduled to take effect on December 12, 1993.

On November 8, 1993, the six refineries, the state, and the Regional Board agreed on a settlement pursuant to which the refineries and WSPA would consent to dismissal of their state court action, and the Board would issue a Cease and Desist Order ("CDO"). The Board published the proposed settlement and CDO in the days that followed, and noticed public hearings on them.

The principal terms of the settlement were that the three refineries that had not complied with their final selenium limits—Unocal, Exxon, and Shell—would receive a nearly five year extension until July 31, 1998 of their deadline for complying with their final limits, and in exchange would pay the state $2 million and, along with the other refineries, would drop their state court action. Oddly, however, neither the settlement agreement nor the CDO expressly state that Unocal, Exxon, and Shell are relieved from having to comply with the final limits contained in their NPDES permits until July 31, 1998. Rather, the CDO effects this purported extension by providing that Unocal, Exxon, and Shell

> shall cease and desist from discharging waste in violation of [their NPDES permits] by complying with the following:
>
> * * * * * *
>
> 3. Compliance with this Order shall be in accordance with the following tasks and time schedules:
>
> * * * * * *
>
> c. The dischargers shall implement a removal technology or technologies, or an alternate control strategy, which has been determined by the dischargers to be capable of achieving compliance with the discharge limitations as specified in [the NPDES permits] and shall comply with these limits, no later than July 31, 1998.

CDO at 7. The settlement agreement stated that the above-quoted provision of the CDO

"effectively modified" the deadlines specified in defendants' NPDES permits for complying with the final selenium limits. The CDO also provided that Unocal, Exxon, and Shell would implement a study to identify technologies for reducing selenium discharge levels, and would carry out pilot tests and source reduction studies.

The terms of the settlement agreement dismissing the refineries' state court suit specified that the dismissal was to be "without prejudice" and expressly provided that nothing in the agreement waived the refineries' right to challenge the validity of the final limits contained in their NPDES permits. The refineries agreed only to refrain from challenging the final limits unless and until the refineries should find in 1998 that they are unable to identify or implement a workable removal technology or other control strategy that would enable them to meet the limits, and the Board declines to extend the July 31, 1998 deadline further. Thus, in effect, the refineries merely agreed to drop their challenge to the final limits so long as the limits are not being enforced, but retained the right to challenge them once they are.

On November 19, 1993, and December 15, 1993, public hearings on the CDO were held at which the instant plaintiffs and other members of the public testified. The Board made some minor modifications to the CDO in response to comments received from the public and from EPA, and issued a final CDO on January 19, 1994. Plaintiffs filed these lawsuits on March 2, 1994.

## II. LEGAL STANDARD

Dismissal is appropriate under Fed.R.Civ.P. ("Rule") 12(b)(6) when a plaintiff's complaint fails to state a claim upon which relief can be granted. The Court must accept as true the factual allegations of the complaint and indulge all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff. *Dodd v. Spokane County,* 393 F.2d 330, 334 (9th Cir.1968); *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Unless the Court converts the Rule 12(b)(6)

motion into a motion for summary judgment, the court may not consider material outside of the complaint. *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). However, "on a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment." *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986). Matters of public record include court and agency orders and agency regulations. *Id.* Thus, this Court may take judicial notice on this motion of rulings and regulations issued or published by the Regional Board or by EPA, regardless whether such documents were filed as attachments to the complaint.

■ The Court must construe the complaint liberally, and dismissal should not be granted unless "it appears to a certainty that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Intake Water Co. v. Yellowstone River Compact Comm'n,* 769 F.2d 568, 569 (9th Cir.1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986). However, legal issues on which the actionability of the claim depends can and should be resolved at this stage. Dismissal is appropriate if, as a consequence of such resolution, the court determines that, as a matter of law, the complaint's allegations fail to state a claim.

Dismissal is appropriate under Rule 12(b)(3) where venue in a case does not properly lie in the court in which it is filed. However, where the court deems it to be "in the interest of justice," the court may instead transfer an improperly venued case to a court in which it could have been brought. 28 U.S.C. § 1406(a).

### III. DISCUSSION

In their complaints in each of these two related cases, plaintiffs allege three causes of action: that defendant has not complied with an applicable effluent standard or limitation—to wit, the final selenium limits and accompanying compliance deadline contained in their NPDES permits—in violation of the Clean Water Act, 33 U.S.C. § 1311(a); that defendant has not complied with an applica-

ble water quality standard, also in violation of the Clean Water Act; and that defendant has engaged in an unfair business practice in violation of California Business & Professions Code § 17200 *et seq.*

As to the first cause of action, defendants contend that the CDO issued by the Regional Board properly extended the deadline by which defendants are required to comply with the selenium discharge limits specified in their NPDES permits, such that their present failure to meet that limit does not violate the federal Clean Water Act. Alternatively, defendants argue that, in any event, plaintiffs may not bring a citizen suit to enforce the effluent standards specified in defendants' NPDES permits because the Regional Board has already taken enforcement action as to that violation and defendants have paid a penalty, thereby precluding a parallel citizen enforcement suit under 33 U.S.C. § 1319(g)(6)(A)(iii). Finally, defendants charge that plaintiffs' suits are barred for failure to satisfy the notice requirements imposed under 33 U.S.C. § 1365(b)(1)(A) for citizen suits.

As to the second cause of action, defendants urge that water quality standards—as distinct from effluent standards—are not enforceable in citizen suits under the Clean Water Act and that the count must consequently be dismissed. As for the third cause of action, defendants contend that dismissal of the first two claims necessitates dismissal of the third state law claim as well. Finally, defendant Exxon charges that the suit against it must be dismissed for improper venue since its refinery is not located within the geographic area for which venue properly lies in this Court.

### A. VENUE IN *CITIZENS FOR A BETTER ENVIRONMENT V. EXXON*

■ The citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, under which plaintiffs have brought these suits, contains a special venue provision stating that

Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such

standard or limitation may be brought under this section *only* in the judicial district in which such source is located.

33 U.S.C. § 1365(c)(1) (emphasis added). As is clear on the face of the complaint, Exxon's refinery is located in the City of Benicia, *see* Complaint ¶ 9, which is within the County of Solano. Solano County is in the geographic region covered by the U.S. District Court for the Eastern District of California, not this Court. 28 U.S.C. § 84(b). The Eastern District is therefore the only district in which venue is proper under the Act. On this basis, Exxon urges that the Court dismiss the suit for improper venue pursuant to Rule 12(b)(1). Conceding this venue error in their opposition papers, plaintiffs urge that the Court transfer the case to the Eastern District rather than dismiss it.

28 U.S.C. § 1406(a) instructs that:

The district court of a district in which is filed a case laying venue in the wrong ... district shall dismiss, or if it be in the interest of justice, transfer such case to any district ... in which it could have been brought.

Whether the interest of justice militates in favor of transfer rather than dismissal is a judgment committed to the sound discretion of the district court. "[T]ransfer is generally ... consistent with the 'interest of justice' ... because it eliminates the delay and additional expense associated with reinstituting suit in another forum." *Banque de la Mediterranee–France, S.A. v. Thergen, Inc.,* 780 F.Supp. 92, 95 (D.R.I.1992). On the facts of this case, the Court holds that transfer rather than dismissal is appropriate. Accordingly, it is hereby ordered that *Citizens for a Better Environment–California v. Exxon,* No. C 94–0713 TEH, shall be TRANSFERRED FORTHWITH from this Court to the U.S. District Court for the Eastern District of California. In view of this ruling, the remainder of this opinion and order shall address only the motion to dismiss filed by the defendant in the Unocal case.

## B. FIRST CAUSE OF ACTION: VIOLATION OF EFFLUENT STANDARD OR LIMITATION

 Under the Clean Water Act, dischargers are strictly liable for any violation of the terms of an NPDES permit. *California Public Interest Research Group v. Shell,* 840 F.Supp. 712, 714 (N.D.Cal.1993). As explained above, the Act authorizes private parties to bring citizen suit enforcement actions, and provides, in pertinent part, that such actions may be brought against

any person ... who is alleged to be in violation of ... an effluent standard or limitation under [the Act].

33 U.S.C. § 1365. *See* 33 U.S.C. § 1365(f) (defining "effluent standard or limitation"). As noted above, the definition of "effluent standard[s] or limitation[s]" for which violations are actionable under this section includes effluent standards or limits prescribed in NPDES permits, since violation of such limits places a polluter in violation of 33 U.S.C. § 1311(a). Additionally, violations of terms contained in NPDES permits are generally enforceable of their own accord in citizen suits. *See* 33 U.S.C. § 1365(f)(6).

There is no dispute that on December 12, 1993—the date the final selenium limits took effect under Unocal's NPDES permit—and every day since then, Unocal's discharges of selenium have exceeded the daily limits under its NPDES permit. Rather, Unocal contends that plaintiffs' citizen suit should be dismissed on the grounds: (1) that the CDO issued by the Regional Board properly extended the deadline by which defendant is required to comply with the final selenium discharge limits specified in its NPDES permit, such that the deadline specified in its permit is no longer in effect; (2) that, in any event, the citizen suit is barred under 33 U.S.C. § 1319(g)(6)(A)(iii) because the state agency charged with enforcing the Act, acting pursuant to a "comparable" state law, has already issued a "final order" regarding the violation, assessing a "penalty" against Unocal which Unocal has paid; and (3) that plaintiffs have failed to satisfy the notice requirements for a citizen suit. Each of these objections, if correct, would provide an independently adequate basis for dismissing plaintiffs' suit. Thus, in order to avoid dismissal, plaintiffs must establish that none of these objections is well-founded.

### 1. WHETHER, ON THE MERITS, THERE IS NO VIOLATION OF UNOCAL'S NPDES PERMIT BECAUSE THE REGIONAL BOARD'S CDO VALIDLY EXTENDED THE COMPLIANCE DEADLINE CONTAINED IN UNOCAL'S PERMIT

█ Unocal's first argument for dismissing plaintiffs' claim under the Clean Water Act seeking to enforce compliance with an effluent standard or limitation—plaintiffs' first cause of action—is that, on the merits, Unocal has not violated its NPDES permit because the CDO issued by the Regional Board validly extended until 1998 the deadline for complying with the final selenium limit specified in the NPDES permit.[1] As recounted above, pursuant to the settlement reached by the Regional Board, the State Attorney General's Office, and the Bay Area oil refineries in late 1993, the Regional Board issued a CDO containing several terms that had been agreed to in the settlement. The CDO provided, in pertinent part:

IT IS HEREBY ORDERED, pursuant to Section 13301 of the California Water Code, that Shell Oil Company, Union Oil Company of California, and Exxon Company, U.S.A. shall cease and desist from discharging waste in violation of Order No. 91-026 [—the order amending the refiner-

ies' NPDES permits to impose final selenium discharge limits—] by complying with the following:

\* \* \* \* \* \*

3. Compliance with this Order shall be in accordance with the following tasks and time schedules:

\* \* \* \* \* \*

c. The dischargers shall implement a removal technology or technologies, or an alternate control strategy, which has been determined by the dischargers to be capable of achieving compliance with the discharge limits specified in Order No. 91-026 and shall comply with these limits, no later than July 31, 1998.

CDO at 7.

█ Unocal concedes both (1) that the CDO did not purport to modify Unocal's NPDES permit, and (2) that even if it did purport to do so, such a modification would not have been valid. Any such putative modification would have been invalid for three reasons. First, modifications to NPDES permits must be implemented in accordance with standards and procedures specified in federal agency regulations which were not followed here.[2] Second, even if a purported

---

1. Unocal labels this argument a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), reasoning that if the NPDES limits are effectively suspended such that Unocal has not violated an effluent limit, then this Court lacks subject matter jurisdiction, for 33 U.S.C. § 1365(a) confers jurisdiction over citizen suits against polluters only where violations of effluent standards or other orders exist. However, the Supreme Court has held that, generally, assertion of a claim under a federal statute "alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the [statute] does provide the claimed rights." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). In such cases, a finding of no statutory violation results in dismissal for failure to state a claim rather than for lack of jurisdiction. The Court will therefore treat Unocal's argument here as a motion to dismiss for failure to state a claim. Ultimately, however, the label affixed to the motion is unimportant. Regardless whether dismissal on such grounds is correctly characterized as based on absence of jurisdiction or failure to state a claim, in both cases it hinges on the same legal ques-

tion: whether the Board's action, as a matter of law, suspended the final limits and deadline contained in Unocal's NPDES permit.

2. The procedures for NPDES permit modification are mandatory. Cal.Code Regs. tit. 23, § 2235; 40 C.F.R. § 123.25(a)(22); *Ackels v. U.S. E.P.A.,* 7 F.3d 862, 864 n. 1 (9th Cir.1993); *United States v. Metropolitan District Commission,* 16 Envtl.L.Rep. 20621, 20624, 1985 WL 9071 (D.Mass.1985). Unless properly modified in accordance with these procedures, the permit as originally issued remains in effect, and violations of the permit may be subject to a citizen enforcement suit. *Public Interest Research Group v. Yates Industries,* 757 F.Supp. 438, 445 (D.N.J. 1991); *Metropolitan District Commission,* 16 Envtl.L.Rep. at 20624, 1985 WL 9071.

First, the enforcement agency modifying the permit must make a finding of cause appropriate for modifying the permit. 40 C.F.R. §§ 122.-41(f), 122.62, 122.63. The Regional Board made no such finding in this case. Second, the enforcement agency must prepare a draft permit and issue a fact sheet setting forth the significant factual, legal, methodological, and policy questions considered in preparing the draft permit, or

modification had been procedurally proper, it would have violated a substantive requirement of the 1987 Clean Water Act Amendments which establish a three-year deadline for a polluter's coming into compliance with water quality standards imposed pursuant to 33 U.S.C. § 1314(*l*)(1)(D), such as those contained in Unocal's NPDES permit.[3] The three-year deadline for Unocal and the other refineries' permits was triggered, at the very latest, on February 20, 1991, when the Board issued its order amending the NPDES permits to include the final selenium limits. In light of that fact, any ruling purporting to extend the compliance deadline beyond February 20, 1994 would violate the statutory three-year deadline. Third, any purported modification to Unocal's permit would have violated another substantive requirement of the 1987 Clean Water Act Amendments, the "anti-backsliding" provision, which forbids permits of the type held by Unocal from being "renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit," subject to certain exceptions. 33 U.S.C. § 1342(*o*)(1).[4]

■ Rather than contending that its permit was "modified" by the CDO, Unocal argues instead that a deadline for complying with effluent standards specified in an NPDES permit may permissibly be extended through an administrative enforcement order issued by the state agency that issued the permit. Unocal makes the novel argument that though such an enforcement action cannot "modify" a permit, an extension granted under such an order constitutes a valid authorization that has the legal effect of suspending the effect of the permit requirements such that a polluter is shielded from citizen suits seeking to enforce compliance with the permit's original deadline and limits.

■ It is clear that California law authorizes Regional Boards to issue CDO's that purport to grant polluters an extended time schedule within which to come into compliance with discharge limits. *See* Cal. Water Code § 13301.[5] However, Unocal can point to no case where a federal court has held that a state enforcement action that does not satisfy the requirements to qualify as a valid "modification" of an effluent standard or limit contained in an NPDES permit, can nonetheless suspend the permit limit, shielding the polluter from having the terms of the permit enforced against it through a citizen suit.[6] Indeed, the only analogous case cited

take other mandatory steps to ensure careful assessment of alternatives. 40 C.F.R. §§ 124.6, 124.8(a), 124.10, 124.11, 124.12, 124.56. The Regional Board did not follow these procedures in this case. Furthermore, the Board's notice of hearing on the CDO makes no reference to a permit modification, further indicating that the Board did not purport to be modifying the refineries' permits.

3. As discussed above, 33 U.S.C. § 1314(*l*)(1)(D) requires that individual control strategies (ICS's) be adopted in order to achieve reduction in pollution levels in certain waters designated pursuant to 33 U.S.C. § 1314(*l*)(1)(D). An ICS must impose limits on toxic pollutants sufficient to attain water quality standards within three years. 33 U.S.C. § 1314(*l*)(1)(D); 40 C.F.R. § 123.46; *Westvaco Corp. v. U.S. E.P.A.*, 899 F.2d 1383, 1385 (4th Cir.1990). To that end, Unocal's NPDES permit compelled it to reduce selenium discharges to meet certain limits by December 12, 1993, which was within three years of the February 20, 1991 issuance of the Board's order amending the permit to impose the final selenium limits.

4. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) of this

title or section 1313(d) or (e) of the title [all concerning water quality standards], a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit....

33 U.S.C. § 1342(*o*)(1). *See New Jersey Public Interest Research Group v. New Jersey Expressway Auth.*, 822 F.Supp. 174, 185 (D.N.J.1992).

5. When a regional board finds that a discharge of waste is taking place or threatening to take place in violation of requirements or discharge prohibitions prescribed by the regional board or the state board, the board may issue an order to cease and desist and direct that those persons not complying with the requirements or discharge prohibitions (a) comply forthwith, (b) comply in accordance with a time schedule set by the board, or (c) in the event of a threatened violation, take appropriate remedial or preventative action.

....

Cal.Water Code § 13301.

6. Again, this argument by Unocal is distinct from its separate argument that, even if the final limits contained in Unocal's NPDES permit did, in

by the parties indicates the opposite. That case, *United States v. Bedford,* 1987 U.S.Dist. LEXIS 16103 (N.D.Ohio 1987), *adopted,* 1988 U.S.Dist. LEXIS 18612 (N.D.Ohio 1988), held that a state enforcement action that purported to suspend the terms of an NPDES permit, but which did not qualify as a valid "modification" of the permit, did not prevent the federal government from bringing a civil enforcement action in federal court pursuant to 33 U.S.C. § 1319(b) to enforce the terms of the permit. 1987 U.S.Dist. LEXIS 16103, at *10–*12. 33 U.S.C. § 1319(b) authorizes the U.S. Attorney General to bring suit to enforce compliance with, *inter alia,* effluent limits imposed under NPDES permits. Since the instant citizen suit also seeks enforcement of permit limits,[7] *Bedford* is authority for the proposition that the Regional Board's CDO did not suspend the final limits and deadline contained in Unocal's NPDES permit such that those terms may not still be enforced against it.

Unocal attempts to draw support for its position from language found in *Sierra Club v. Colorado Refining Co.,* 838 F.Supp. 1428, 1436 (D.Colo.1993). However, *Colorado Refining Co.* concerned only whether a state enforcement action erected a 33 U.S.C. § 1319(g)(6)(A) preclusive bar against a citizen suit, and expressed no opinion on Unocal's instant argument. Unocal's citations to *Northwest Environmental Advocates v. Portland,* 11 F.3d 900, 906–11 (9th Cir.1993), and this Court's recent opinion in the related case of *California Public Interest Research Group v. Shell Oil Co.,* 840 F.Supp. 712 (N.D.Cal.1993), are similarly inapposite. *Portland,* as discussed later in this opinion, involved entirely different issues. Similarly,

the language quoted from *Shell* stating that "any challenge to effluent limits in an NPDES permit presents a matter for the Water Board, not this Court, to address," 840 F.Supp. at 712, concerns just what it says: the circumstances under which a discharger may bring suit in federal court to *challenge* limits contained in an NPDES permit promulgated by a state enforcement agency. *Shell* in no way addresses the entirely separate issue of citizen suits to *enforce* permit limits.

In its reply papers, Unocal also cites an administrative ruling issued by the Environmental Appeals Board of EPA, *In the Matter of Star–Kist Caribe, Inc.,* NPDES Appeal No. 88–5, 1990 NPDES LEXIS 4 (April 16, 1990), as supporting their argument that a non-modification can nonetheless excuse non-compliance with an NPDES permit. The language from *Star–Kist* cited by Unocal simply states that EPA has authority, under 33 U.S.C. § 1319(a), to issue compliance orders that extend the deadlines for polluters to come into compliance with their NPDES permit requirements. That proposition is non-controversial. *Star–Kist* does not address the subtly but significantly different issue of the effect of such extensions: whether EPA compliance orders extending NPDES permit deadlines suspend the effect of the permit requirements such that polluters are shielded against citizen suits seeking to enforce compliance with the permit limits. Nor does *Star–Kist* address the analogous issue that is presented on this motion: whether *state* compliance orders extending NPDES permit deadlines can suspend the effect of permits such that their terms may no longer be enforced through citizen suits.

theory, take effect on December 12, 1993, and are still in force today, enforcement of those limits through a citizen suit is precluded under 33 U.S.C. § 1319(g)(6)(A)(iii). That separate argument is addressed by the Court later in this opinion. *See infra* Part III.B.2.

7. 33 U.S.C. § 1319(b), the enforcement provision involved in *Bedford,* authorizes the Attorney General to sue polluters who violate, *inter alia,* 33 U.S.C. § 1311(a). 33 U.S.C. §§ 1319(a), (b). As noted above, violation of effluent limits imposed under an NPDES permit places a permit-holder in violation of 33 U.S.C. § 1311(a). *See* discus-

sion *supra* Part I.A. As also noted above, citizen suits may be brought under 33 U.S.C. § 1365 for violations of, *inter alia,* 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1). Thus, NPDES permit limits that are enforceable by the federal government under 33 U.S.C. § 1319(b) are also enforceable through citizen suits. The only exception to this proposition obtains where a citizen suit is precluded under 33 U.S.C. § 1319(g)(6)(A) by a pending or final state or federal enforcement action. This separate bar to citizen suits is discussed later in the opinion. *See infra* Part III.B.2.

■ At first blush, it may not appear obvious how to assemble the different component parts of the statutory scheme at issue here into a coherent whole. First, there exist the very stringent procedures and substantive rules limiting the circumstances under which enforcement agencies may "modify" the terms of NPDES permits. Second, there exists authorization for enforcement agencies to bring civil penalty actions, *see* 33 U.S.C. § 1319(g), pursuant to which compliance schedules may, *de facto*, be extended, since such actions preclude citizen suits to enforce the NPDES permits. *See* 33 U.S.C. § 1319(g)(6)(A)(iii).[8] Third, there exists authorization for enforcement agencies to bring non-penalty civil compliance actions, *see* 33 U.S.C. § 1319(a),[9] pursuant to which compliance schedules may be extended, *Star–Kist,* 1990 NPDES LEXIS 4, at *21, but which nonetheless do *not* bar citizen suits to enforce the terms of the original NPDES permits. *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883 (9th Cir.1993).

The element of the scheme the role of which may at first appear difficult to reconcile is the non-penalty civil compliance action. On the one hand, it is clear that such actions cannot amend NPDES permits to postpone compliance deadlines, *Star–Kist,* 1990 NPDES LEXIS 4, at *6, and do not trigger the statutory preclusive bar against citizen suit enforcement of limits contained in NPDES permits. *Pendleton,* 11 F.3d 883. On the other hand, however, it is also clear that EPA *can* authorize extended compliance schedules in the course of such compliance actions, *Star–Kist,* 1990 NPDES LEXIS 4, at *6, and that Regional Water Quality Control Boards can do the same under California law. Cal. Water Code § 13301. If such extended compliance schedules do not suspend the effect of limits and deadlines contained in NPDES permits such that the permit terms may still be enforced against the polluter through citizen suits, then what good are compliance actions and what meaning do their extended timetables have? The answer to this question is that such orders constitute agreements by the issuing enforcement authority on how the authority—be it EPA or a state agency—plans to exercise its prosecutorial discretion. Given that such authorities are vested with enforcement powers broader in some respects than those conferred on private citizens under the citizen suit provision, and that in the vast majority of cases there exists no serious threat of citizen suit enforcement, assurances regarding authorities' intended exercise of their enforcement discretion carry great real-world significance. *See Shell,* 840 F.Supp. at 716–17 (construing language in NPDES permit as an assurance as to how the Regional Board intended to exercise its prosecutorial discretion, and not as a term modifying and weakening the permit's effluent limit). Thus, even if they cannot shield polluters from citizen suits brought to enforce the terms of NPDES permits, such actions still serve a meaningful role in the Clean Water Act enforcement scheme.

■ With this tension resolved, the Court concludes that, when viewed as a whole, the structure of the Clean Water Act clearly evidences a legislative intent on the part of its drafters that disfavors the interpretation urged by Unocal regarding the effect of deadline extensions contained in administrative compliance orders. As explained above, the statute imposes a variety of stringent conditions before administrative actions can modify the terms of NPDES permits. Moreover, as discussed in the next section, the statute also expressly provides that citizen suits are barred only in circumstances where certain specified types of agency enforcement actions have been taken by state or federal enforcement agencies. Unocal, in effect, contends that administrative extensions of permit deadlines can bar citizen suits to enforce

---

8. Although 33 U.S.C. § 1319(g) authorizes only *federal* civil penalty actions brought by EPA, 33 U.S.C. § 1319(g)(6)(A)(iii) provides that penalty actions brought by *state* agencies under comparable state laws trigger the same preclusive bar against citizen suits to enforce NPDES permits.

9. Although 33 U.S.C. § 1319(a) authorizes only *federal* non-penalty civil compliance actions brought by EPA, as noted above, California Water Code § 13301 authorizes regional water boards to bring non-penalty civil compliance actions pursuant to which a revised compliance time-tables may be established. *See supra* note 5.

permits even where the extensions neither (1) qualify as "modifications," nor (2) satisfy the requirements of the provision that expressly bars citizen suits in some circumstances. Recognition of such an unenumerated category of administrative extension would render superfluous the very specific requirements established by Congress for permit modifications and preclusion of citizen suits. The canon of statutory construction strongly disfavors such interpretations that do not accord meaning to every word and provision in a statute, or to statutory distinctions drawn by Congress. *See United States v. Nordic Village, Inc.*, —— U.S. ——, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) ("[It is a] settled rule that a statute must, if possible, be construed in such a fashion that every word has some operative effect."); *In the Matter of Greystone III Joint Venture*, 948 F.2d 134, 138–39 (5th Cir.1991) (interpretation of one statutory provision so as to render another provision superfluous "is anathema to elementary principles of statutory construction"). By writing these provisions out of the statute, Unocal's construction would create an enormous loophole, elevating civil compliance orders to the status of *de facto* modifications, thereby allowing dischargers to achieve, in effect, modifications that would otherwise be illegal under the Act. The existence of these specific provisions in the statute creates a strong inference that Congress did not intend to authorize unenumerated exceptions of the sort urged by Unocal.[10]

In light of the above, the Court holds that, as a matter of law, an administrative enforcement action by a state agency charged with enforcing the Clean Water Act that purports to extend a deadline specified in an NPDES permit for complying with the permit's discharge limits does not serve to suspend the permit's deadlines such that they may not be enforced through a citizen suit. Such an extension, unless it satisfies the requirements to qualify as a "modification," is simply a statement by the agency as to how it plans to exercise its prosecutorial discretion. Unocal's motion to dismiss plaintiffs' first cause of action on this ground is therefore DENIED.

### 2. WHETHER A CITIZEN SUIT IS PRECLUDED UNDER THE 33 U.S.C. § 1319(g)(6)(A)(iii) BAR

As noted above, the Clean Water Act expressly provides that citizen suits are barred in circumstances where certain categories of agency enforcement action have either been concluded or are pending with respect to an alleged violation. Unocal contends that the CDO issued by the Regional Board qualifies as an enforcement action that suffices to trigger a preclusive bar against the instant citizen suit, thereby requiring its dismissal.

33 U.S.C. § 1319(g)(6)(A) provides:

**10.** Additional support for this conclusion can be inferred from *Washington Public Interest Research Group v. Pendleton Woolen Mills*, 11 F.3d 883 (9th Cir.1993). In *Pendleton*, the EPA issued an administrative compliance order to a polluter that had violated the discharge limits specified in its NPDES permit. The EPA order set an extended compliance schedule, and ordered the polluter to make certain identified physical improvements deemed to be necessary to bring about compliance, and threatened sanctions if the polluter did not comply with the terms of the compliance order. Subsequently, an environmental group filed a citizen suit seeking, *inter alia*, an injunction requiring *immediate* compliance with the discharge limits specified in the permit. The Ninth Circuit held that because the type of enforcement action that EPA had taken was *not* an administrative penalty action under 33 U.S.C. § 1319(g) but rather an administrative compliance action under 33 U.S.C. § 1319(a), a citizen suit could still be maintained to enforce the limits and deadlines contained in the original permit. (As noted above and discussed below,

penalty actions can trigger the 33 U.S.C. § 1319(g)(6)(A) preclusive bar against citizen suits.)

The *Pendleton* defendant apparently did not expressly raise the argument made by Unocal that the administrative order extending the compliance deadline suspended the effect of the permit deadline such that it was not enforceable through a citizen suit. However, in reversing, the Ninth Circuit implicitly rejected this argument, for the argument would have afforded an alternative basis for affirming the district court's dismissal, and the court of appeals will normally affirm so long as there exists any alternative ground, fairly supported in the record, that would justify the district court's ruling. *Golden Nugget, Inc. v. American Stock Exch., Inc.*, 828 F.2d 586, 590 (9th Cir.1987) (affirmance on alternative ground appropriate where the record adequately establishes material facts and issues are purely legal). Thus, the *Pendleton* holding supports an inference that the Ninth Circuit was not persuaded by Unocal's argument.

[A]ny violation—

(i) with respect to which the Administrator [of the EPA] or the Secretary [of the Army] has commenced and is diligently prosecuting an action under [33 U.S.C. § 1319(g), which allows EPA to assess civil penalties],

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to [33 U.S.C. § 1319(g) ], or

(iii) *for which* the Administrator, the Secretary, or *the State has issued a* **final** *order not subject to further judicial review and the violator has paid a* **penalty** *assessed under [33 U.S.C. § 1319(g) ], or such* **comparable** *State law,* as the case may be,

shall not be subject to a civil penalty action under [33 U.S.C. § 1319(d) ] or [33 U.S.C. § 1321(b) ] or [a citizen suit under 33 U.S.C. § 1365].

(Emphasis added). Unocal contends that the CDO and the settlement agreement constitute "a final order" under a state law "comparable" to 33 U.S.C. § 1319(g) for which the violator has paid an assessed "penalty," thereby triggering the citizen suit bar under 33 U.S.C. § 1319(g)(6)(A)(iii). In order for dismissal on this ground to be appropriate, all of these conditions must be met.

### a. "Final Order"

Plaintiffs argue that the CDO and settlement agreement do not constitute a "final order not subject to further judicial review." Under the settlement agreement, Unocal and the other refineries expressly retained the right to challenge in court in 1998 the final selenium limits specified in their NPDES permits when, under the CDO, they are finally obligated to comply with those limits.[11] In light of this provision, there indeed appears to be a substantial issue as to whether the CDO is a "final order" within the meaning of 33 U.S.C. § 1319(g)(6)(A)(iii). However, because this issue was not well briefed by the

parties and since there exist other bases for denying dismissal on preclusion grounds, the Court declines to reach this question.

### b. "Comparable State Law"

The 33 U.S.C. § 1319(g)(6)(A)(iii) preclusive bar applies only where "the violator has paid a penalty assessed under [33 U.S.C. § 1319(g) ], or such comparable State law." In evaluating whether this provision is satisfied in this case, the Court must determine, first, what state law the putative penalty was assessed under and, second, whether that law is "comparable" to 33 U.S.C. § 1319(g).

### i. The Regional Board's Action Was Taken under California Water Code § 13301

California law vests regional water boards with a variety of different prosecutorial tools for enforcing compliance with effluent limits or standards imposed under NPDES permits. These include issuance of cease and desist orders under California Water Code § 13301, issuance of cleanup or abatement orders under California Water Code § 13304, imposition of administrative civil penalties under California Water Code § 13385, and referral to the California Attorney General for civil prosecution.

It appears quite clear that in issuing the CDO, the Regional Board was exercising its authority under California Water Code § 13301, which empowers regional boards to issue cease and desist orders pursuant to which such boards may establish extended time-tables for compliance with Board-imposed effluent limits. Cal.Water Code § 13301(b). The CDO itself expressly states that it was issued "pursuant to Section 13301 of the California Water Code." CDO at 7. Moreover, the CDO offers the following explanation of the decisionmaking process that resulted in the settlement and issuance of the CDO:

The Regional Board has considered the various enforcement and penalty options available to it regarding violation of [the NPDES permit], including the issuance of

---

11. The settlement agreement provides that the refineries agree not to challenge the final selenium limits in court in 1998 if they are able to win an additional extension of the compliance schedule pursuant to ¶ 5 of the CDO. However, that

concession is no concession at all, for if the refineries succeed in obtaining such an additional extension of the compliance deadline, then, of course, there will be no reason for them to challenge the limits.

a cease and desist order or a cleanup or abatement order, imposition of an administrative civil penalty and referral to the Attorney General for civil prosecution. Under the circumstances detailed in the Findings set forth above, the Regional Board has determined that the most appropriate course of action is settlement of the litigation and issuance of a cease and desist order.

CDO at 6.

Unocal appears to argue that since Unocal, Exxon, and Shell agreed to make a $2 million payment to the state as part of the settlement of which the CDO was a component, the Regional Board's enforcement action must be construed as a civil penalty action under California Water Code § 13385. Unocal speculates that if it, Exxon, and Shell had refused to agree to the payment, the Regional Board would then have instituted a civil penalty action under § 13385. However, as noted above, the CDO expressly categorized the actions taken as (1) entry of a cease-and-desist order under § 13301, and (2) settlement of the refineries' state court lawsuit. The fact that the Board identified its actions as such after first noting the different enforcement options available to it—including the option of imposing of a civil penalty under § 13385—makes clear that the Board expressly declined to invoke its § 13385 authority in issuing the CDO and entering the settlement agreement. The only mention of the $2 million payment in the CDO is found in the "findings" section, where the payments are described only as a "term" of the settlement of the state court lawsuit, CDO at 6; no mention of the payment appears in the "order" section of the CDO, and the document does not purport to order payment of the sum.

This labeling clearly was not accidental. The CDO and settlement agreement resulted from lengthy and detailed negotiations among the parties. The Court sees no reason to disregard the Regional Board and the parties' deliberate decision to label the Board action a cease-and-desist order, and the accompanying document a settlement agreement. If the Board and the parties had intended for the Board order and settlement

agreement to be deemed a settlement of a threatened but unfiled civil penalty action, they could easily have so indicated. The Court must conclude from their failure to do so that they did not so intend. Since the Regional Board is vested with authority to choose which of its enforcement options to exercise, the Board's categorization of its action as a cease-and-desist action under § 13301 is dispositive of the question of what type of enforcement action the Board attempted to take.

In light of the above, the Court concludes that, as a matter of law, the CDO was issued in an exercise of the Board's administrative enforcement authority under California Water Code § 13301 to issue cease and desist orders establishing time-tables for compliance with Board-imposed effluent limits. The Court further concludes that, as a matter of law, the settlement agreement was just that—a settlement of the refineries' state court lawsuit. The Court rules that, as a matter of law, neither instrument constituted an exercise of the Board's authority under California Water Code § 13385 to impose civil penalties.

ii. **The "Comparability" Assessment Is Conducted By Examining the Particular State Statutory Enforcement Provision Involved, Not the State Statutory Enforcement Scheme as a Whole**

The thrust of Unocal's argument as to why the "comparability" requirement is satisfied in this case focuses not on the particular statutory power that the Board was exercising in issuing the CDO and entering the settlement, but rather on the California law enforcement scheme as a whole. Unocal argues that even if the CDO was issued pursuant to California Water Code § 13301 and even if, as the Court concludes below, that enforcement provision is not comparable to 33 U.S.C. § 1319(g), the comparability requirement is still satisfied because the comparability assessment must be conducted by examining the state statutory enforcement scheme as a whole, not simply the particular state statutory enforcement provision under which the action in question was taken. Unocal argues that the California scheme, when all of its various enforcement provi-

sions are considered, is comparable to 33 U.S.C. § 1319(g), thereby satisfying the requirement.

The issue here is whether the language "comparable state law" should be interpreted to mean "comparable state enforcement scheme" or "comparable state enforcement provision." While quite technical, this interpretive question is an important one which has not yet been resolved by the courts. Research has revealed only a single reported decision discussing this question at any length. That case, *North & South Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552 (1st Cir.1991), did not construe the comparability requirement as it applies under 33 U.S.C. § 1319(g)(6)(A)(iii); rather it interpreted it under a neighboring provision, 33 U.S.C. § 1319(g)(6)(A)(ii), which reads:

[A]ny violation—

 * * * * * *

(ii) *with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to [33 U.S.C. § 1319(g) ]*

shall not be subject to a civil penalty action under [33 U.S.C. § 1319(d) ] or [33 U.S.C. § 1321(b) ] or [a citizen suit under 33 U.S.C. § 1365].

(Emphasis added). However, because the language in the two provisions is parallel and the canon of statutory construction presumes that when Congress uses a term in more than one location in a statute, it is meant to have the same meaning, *see United States v. Thompson/Center Arms Co.*, — U.S. —, — n. 5, 112 S.Ct. 2102, 2107 n. 5, 119 L.Ed.2d 308 (1992) (plurality opinion); *Mississippi Poultry Ass'n, Inc. v. Madigan*, 992 F.2d 1359, 1363 (5th Cir.1993), *Scituate* is relevant to the instant question before this Court.

In *Scituate*, the state was prosecuting an enforcement action under a provision of state law that would not result in imposition of civil penalties against the Clean Water Act violator. Arguing that the comparability assessment required the court to compare the particular state enforcement provision used by the state with 33 U.S.C. § 1319(g), the citizen suit plaintiff contended that the preclusive bar was not triggered since the state

was proceeding under a provision that, unlike 33 U.S.C. § 1319(g), did not authorize imposition of civil penalties. However, the *Scituate* court concluded that, for policy reasons, the comparability requirement should be applied to the state enforcement scheme as a whole, not the particular enforcement provision at issue. The court reasoned that provision-by-provision analysis would mean that some state enforcement actions would not trigger the bar against citizen suits, and would thereby allow duplicative enforcement proceedings. The *Scituate* court concluded that Congress meant for citizen suits to be available only where the state is not addressing the problem at all, and not simply wherever a state decides not to seek civil penalties. *Scituate*, 949 F.2d at 555–56.

This Court is not persuaded by the reasoning of the *Scituate* court. For several reasons, the Court concludes that the comparability assessment must be made by looking to the particular state enforcement provision at issue, not the state scheme as a whole. First, the structure of § 1319(g) supports an inference favoring this conclusion. The Clean Water Act empowers EPA to respond to violations using any of a variety of enforcement options. However, the statute specifies that only where one specific type of EPA enforcement action—a penalty action under 33 U.S.C. § 1319(g)—has been taken are citizen suits precluded under 33 U.S.C. § 1319(g)(6)(A)(iii). *Pendleton*, 11 F.3d at 885–86. Since whether an EPA enforcement action triggers the preclusive bar depends on the particular enforcement provision under which EPA proceeded, it would logically follow that the same would hold for state laws: that only where a state has proceeded (and assessed a penalty) under a state enforcement provision comparable to 33 U.S.C. § 1319(g) is the preclusive bar triggered. It would be odd indeed to construe the statute as requiring courts to conduct a comparison between the federal 33 U.S.C. § 1319(g) enforcement provision on the one hand, and the whole of the state enforcement scheme on the other. Clearly, it is more natural to read 33 U.S.C. § 1319(g)(6)(A)(iii) as requiring a comparison between the specific state enforcement provision actually used and the

specified federal enforcement provision, 33 U.S.C. § 1319(g).

The interpretation urged by Unocal would introduce an anomalous dichotomy into the statute, for state enforcement actions would then enjoy much broader preclusive effects against citizen suits than EPA actions. Any type of state enforcement action would trigger the preclusive bar so long as *somewhere* in the state's enforcement scheme there existed provisions comparable to 33 U.S.C. § 1319(g). Penalties imposed under enforcement provisions not affording procedural safeguards comparable to 33 U.S.C. § 1319(g) would bar citizen suits. Thus, nominal "penalties" imposed under state provisions lacking penalty assessment factors comparable to those enumerated in 33 U.S.C. § 1319(g)(3), and without a right to public notice or opportunity for participation comparable to those provided under 33 U.S.C. § 1319(g)(4), would insulate polluters from citizen actions so long as the state had at its disposal—although had declined to use—other enforcement provisions that are comparable to 33 U.S.C. § 1319(g).

Although the *federal* enforcement scheme, of course, contains all of these features, federal enforcement actions trigger the preclusive bar only where they are taken under one particular enforcement provision: 33 U.S.C. § 1319(g). Surely the preclusive effect of state enforcement actions can be no broader.

Construing the statute to require enforcement provision comparability would not, as the *Scituate* court contended, be inconsistent with sensible policy or with the goals of the Clean Water Act. The Court can easily imagine that Congress, realizing that state enforcement agencies can be susceptible to regulatory "capture" by the industries they regulate, might have feared that state agencies might consent to inappropriately lax compliance agreements. Congress might therefore sensibly have decided that the safeguard enforcement device of the citizen suit should be precluded only where a state has taken an enforcement action that approximates the rigor of a federal 33 U.S.C. § 1319(g) enforcement action.

■ The Court's conclusion as to application of the comparability requirement is also in accord with EPA's own administrative interpretation of the statute. *See* EPA Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act (1987); EPA Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act (1993). This interpretation of a provision of the Clean Water Act by the federal agency charged with its enforcement constitutes persuasive authority and further buttresses the Court's conclusion today.[12]

### iii. California Water Code § 13301 Is Not "Comparable" to 33 U.S.C. § 1319(g)

■ Having concluded that the Court must compare California Water Code § 13301, the state enforcement provision under which the CDO was issued, with 33 U.S.C. § 1319(g) in order to determine whether the 33 U.S.C. § 1319(g)(6)(A)(iii) bar is triggered, the Court has little difficulty deciding that the two provisions are not "comparable."

■ In conducting such a comparability assessment, other courts have drawn guidance from remarks made on the floor of the Senate by Senator John Chaffee, the principal author and sponsor of the 1987 Clean Water Act Amendments. *See Atlantic States Legal Foundation v. Universal Tool*

---

12. Where a legislative intent regarding a particular statutory issue is not evident from a statute's text or legislative history, courts will defer to the interpretation of the law favored by the agency charged with its enforcement, so long as the agency interpretation is not otherwise inconsistent with the plain language of the statute or with other of its provisions. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, this doctrine does not apply in this case, for the Court infers from the statute's text and structure a legislative intent regarding the question at issue. Nonetheless, the agency's interpretation constitutes persuasive authority supporting the Court's conclusion.

EPA has argued in other cases that in order for a state law to be comparable to 33 U.S.C. § 1319(g), it must have been certified as such by EPA pursuant to 33 U.S.C. § 1342(b). *See Scituate*, 949 F.2d at 556 n. 8. However, as this argument has not been raised by the parties on this motion, the Court shall not address it at this time.

*and Stamping Co.,* 735 F.Supp. 1404, 1415 (N.D.Ind.1990) (quoting remarks by Sen. Chaffee). In those remarks, Senator Chaffee stated:

[T]he limitation of [33 U.S.C. § 1319(g) ] applies only where a State is proceeding under a State law that is comparable to [33 U.S.C. § 1319(g) ]. For example, in order to be comparable, a State law *must* provide for a right to a hearing and for public notice and participation procedures similar to those set forth in [33 U.S.C. § 1319(g) ]; it *must* include analogous penalty assessment factors and judicial review standards and it *must* include provisions that are analogous to the other elements of [33 U.S.C. § 1319(g) ].

133 Cong.Rec. S737 (daily ed., Jan. 14, 1987) (emphasis added), *quoted in Universal Tool,* 735 F.Supp. at 1415. EPA has also issued its own administrative interpretation of the comparability requirements. According to EPA, a state enforcement provision, in order to be comparable, must include the features listed by Senator Chaffee: a right to a hearing analogous to that provided under 33 U.S.C. § 1319(g)(2); public notice and participation requirements analogous to those of 33 U.S.C. § 1319(g)(4); a right to judicial review analogous to that provided under 33 U.S.C. § 1319(g)(8); and penalty assessment factors analogous to those enumerated in 33 U.S.C. § 1319(g)(3). EPA Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act (1987), at 4–6. EPA interprets the analogous penalty assessment factor requirement as meaning not only that the maximum potential penalty liability must be at least equivalent to the federal limits, and that the factors to be considered in arriving at the appropriate penalty must be adequate and appropriate, but also that the *actual penalty* collected or assessed must be adequate and appropriate. *Id.* at 5. Support for this interpretation is found in a congressional Conference Report interpret-

ing the comparability requirement under a 1986 version of the Clean Water Act Amendments which contained a provision identical to 33 U.S.C. § 1319(g)(6)(A). (The 1986 bill was not enacted into law, but the following year the 1987 Clean Water Act Amendments were passed, containing the identical provision now codified at 33 U.S.C. § 1319(g)(6)(A).) *See* House–Senate Conference Report on Clean Water Act Amendments, H.Rep. 99–1004, 99th Cong., 2d Sess., *reprinted in* 132 Cong.Rec. 31577, 31616 (1986).[13] EPA also advises that the state law must provide penalty collection authority and streamlined judicial collection procedures analogous to those of 33 U.S.C. § 1319(g)(9). EPA Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act (1987), at 6.

In light of the above legislative history and administrative interpretation by the agency charged with enforcing the statute at issue, the Court holds that the features enumerated in Senator Chaffee's remarks, in the EPA policy guidance, and in the Conference Report, are among those that a state enforcement provision must offer in order to be comparable to 33 U.S.C. § 1319(g). *See Universal Tool,* 735 F.Supp. at 1415.

Examining California Water Code § 13301, the Court notes, even before getting to the above factors, that the California law provision does not authorize imposition of civil penalties. The availability of such a remedy is, of course, a necessary prerequisite for "comparability," as is evident from the fact that 33 U.S.C. § 1319(g)(6)(A)(iii) requires not just that civil penalties be available, but that they actually be imposed before the preclusive bar can be triggered. Second, since the California law provision does not authorize penalties, it of course lacks penalty assessment factors comparable to those enumerated in 33 U.S.C. § 1319(g)(3). The presence of such factors is a requirement for

---

**13.** When a State has proceeded with an enforcement action relating to a violation with respect to which the Administrator [of EPA] or the Secretary [of the Army] is authorized to assess a penalty under this provision the Administrator and the Secretary are not authorized to take any action under [33 U.S.C. § 1319(g) ] if the State demon-

strates that the state-imposed penalty is appropriate.

House–Senate Conference Report on Clean Water Act Amendments, H.Rep. 99–1004, 99th Cong., 2d Sess., *reprinted in* 132 Cong.Rec. 31577, 31616 (1986).

comparability. *Universal Tool*, 735 F.Supp. at 1415.

In light of the Court's rulings on the above factors, it is unnecessary for the Court to proceed further and determine whether the California provision satisfies the other comparability requirements. The Court rules that, as a matter of law, California Water Code § 13301 is not "comparable" to 33 U.S.C. § 1319(g) within the meaning of 33 U.S.C. § 1319(g)(6)(A)(iii).[14]

### c. "Penalty"

The 33 U.S.C. § 1319(g)(6)(A)(iii) preclusive bar applies only where "the violator has paid a *penalty* assessed under [33 U.S.C. § 1319(g)], or such comparable State law" (emphasis added). As noted above, Unocal contends that the $2 million payment that it, Exxon, and Shell agreed to make constitutes a "penalty" within the meaning of the statute.

As used in the Clean Water Act, the word "penalty" is a term of art referring to a payment that a polluter is assessed to pay by an enforcement agency. By its nature, a payment can be a penalty only where the statutory grant of authority exercised by the agency is one that empowers the agency to assess penalties. As explained above, the Court has concluded that in issuing the CDO, the Regional Board *was* exercising its authority under California Water Code § 13301 to issue cease and desist orders, and expressly *was not* exercising its authority under California Water Code § 13385 to impose civil penalties. The Court has also concluded that in entering the settlement agreement, the Board was simply settling the refineries' state court lawsuit and was not purporting to exercise its enforcement authority under either of the above provisions. As California Water Code § 13301 does not empower the Board to assess civil penalties in enforcement actions taken pursuant to it, the Court concludes that the $2 million payment agreed to by Unocal, Exxon, and Shell pursuant to the settlement agreement was not, as a matter of law, a penalty within the meaning of 33 U.S.C. § 1319(g)(6)(A)(iii).

This conclusion is reinforced by the fact that the Board specifically avoided characterizing the payment as a penalty. First, both the CDO and the settlement agreement refer to the payment using only the verb "pay"; both studiously avoid any mention of a "penalty." CDO at 6; Settlement Agreement ¶ 3. Second, at a public hearing on the settlement agreement, the Board's Counsel carefully and deliberately avoided characterizing the settlement monies as a penalty:

> I could perhaps comment further on that question of penalty that Mr. Lozeau [representative of plaintiff San Francisco BayKeeper] raised. I think its true that there is no administrative civil liability action or [section] 13385 of the Water Code action in this case, which is the usual method that the Board takes to assess penalties.
>
> And I think if you look at the expressed language of the settlement, it says, "As part of the settlement, the companies shall collectively pay the Regional Board the sum of two million." The settlement document does not characterize this as a penalty. It characterizes it as a payment. And, therefore, I don't see a need to make any interpretation as to whether this is a penalty or not.

Reporter's Transcript of Proceedings Before Regional Board, Dec. 15, 1993, at 37. Indeed, at the same hearing Ms. Margaret Rosegay, counsel for Unocal and for the refineries in the state court action, went even further, stating:

> It has always been the refineries' position that they have done nothing wrong and as a consequence *it is inappropriate to characterize the payments which are being made to the Board as a penalty.* Nevertheless, the fact remains that it is money which is being paid.... [I]t is being paid as a means of settling the lawsuit. And I

---

**14.** This conclusion is reinforced by *Pendleton*, 11 F.3d 883, for it appears that a cease-and-desist action under California Water Code § 13301 is the equivalent of a federal administrative compliance action under 33 U.S.C. § 1319(a). Since the Ninth Circuit ruled in *Pendleton* that 33 U.S.C. § 1319(a) EPA compliance actions do not trigger the 33 U.S.C. § 1319(g)(6)(A)(iii) preclusive bar, the Court's ruling today that actions taken under a state law counterpart to 33 U.S.C. § 1319(a) are not barred either gives the statutory scheme a logical parallelism.

think, for all practical purposes, it is, in fact, a penalty.

*Id.* at 38 (emphasis added). Although conceding that the payment might, practically speaking, function as a penalty, Ms. Rosegay continued to maintain that, legally speaking, it was not one.[15]

It appears quite clear that Unocal, Exxon, and Shell insisted as a condition of the settlement that the payment not be characterized as a "penalty" in order that the settlement not be construed as an admission of wrongdoing. This choice presumably explains as well why the Board and the refineries went out of their way to describe the enforcement action as a California Water Code § 13301 cease and desist action, rather than a California Water Code § 13385 civil penalty action. Indeed, later during the same public hearing

a member of the Board admitted as much in the face of questioning by a representative of plaintiff Citizens for a Better Environment–California ("CBE"):

> [T]he fact that it's not called penalties was part of negotiations. It is penalties, that's plain and simple what it is.

Reporter's Transcript of Proceedings Before Regional Board, Dec. 15, 1993, at 28 (emphasis added). Although this statement amounts to a frank admission that the payment functions like a penalty, the Board Member speaking expressly kept to the position that there was an agreement not to classify the payment as one.[16]

After having demanded as a condition of the settlement that the Board's enforcement action *not* be an action for civil penalties under California Water Code § 13385 and

---

**15.** Strictly speaking, only the intent of the Regional Board is relevant, since only the Board is empowered to impose penalties. However, the intent and understanding of the refineries is also probative of the Board's intent, since issuance of the CDO and entry the settlement were pursuant to an agreement among those parties.

**16.** Unocal cites comments made at the same public hearing by a representative of plaintiff CBE in which the speaker took issue, not with the Board's refusal to term the payment a "penalty," but rather with the amount of the payment, contending that it was too small. *See* Reporter's Transcript of Proceedings Before Regional Board, Dec. 15, 1993, at 25–28 (comments of Mr. Greg Karras). However, any such comments made by a private citizen who was not a party to the settlement is of no relevance for determining whether the Board, or the other parties to the settlement, intended for the payment to be deemed a "penalty."

Unocal also cites the fact that in a letter commenting on the proposed settlement and CDO, EPA's regional office referred to the $2 million payment as a "penalty." *See* Letter to M. Anne Jennings, from Harry Seraydarian, Director, Water Management Div., EPA Region IX Office, Dec. 13, 1993, at 2. After oral argument, plaintiffs submitted to the court a letter from EPA's regional office in which EPA expressly disavowed that the use of the term "penalty" in the December 13 letter was intended to imply an opinion on the part of EPA on the above legal question. *See* Letter to Steven Ritchie, et al., from Harry Seraydarian, Director, Water Management Div., EPA Region IX Office, date-stamped June 9, 1994. EPA stated that if it had considered the legal question, it would have had to adhere to EPA's position on the application and interpretation of 33 U.S.C. § 1319(g)(6)(A)(iii) set forth in the agency's ad-

ministrative guidelines. *See* EPA Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act (1987); EPA Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act (1993) *cited supra*. However, Unocal argues that the Court may not rely on the clarification contained in the June 9 letter, contending that, for several reasons, judicial notice may not properly be taken of the letter on this motion to dismiss.

The Court finds it unnecessary to address whether it may properly take judicial notice of the June 9 letter on this motion, for the Court concludes that, even disregarding the June 9 letter, the December 13 letter does not lend support to Unocal's contention that the payment was regarded by the parties as a "penalty," in the legal sense of the word. First, the casual use of the term "penalty" in EPA's December 13 letter does not appear intended to constitute expression of an opinion by EPA on the technical legal question of whether the payment qualified, as a matter of law, as a "penalty" within the meaning of 33 U.S.C. § 1319(g)(6)(A)(iii). Second, even if EPA had expressed such an opinion in the letter, that opinion would not be probative of whether the Regional Board and the refineries—the parties that struck the agreement pursuant to which the CDO was issued and the settlement agreement entered—intended for the $2 million payment to be categorized as, for legal purposes, a "penalty." As noted above, it is the intent of the Board and, secondarily, of the refineries, that is relevant in determining whether the payment was meant to be deemed a penalty. *See supra* note 15. As EPA was not a party to settlement and played no role in the Board's enforcement action, its opinion would shed little light on what the Regional Board's intent was regarding the payment.

that the $2 million payment *not* be deemed a "penalty," Unocal now seeks to reverse its position on both of these issues. Unocal cannot have it both ways.

In light of the above, the Court concludes that the $2 million payment agreed to pursuant to the CDO and the settlement agreement does not, as a matter of law, constitute a "penalty" for purposes of 33 U.S.C. § 1319(g)(6)(iii).

### d. Conclusion Regarding 33 U.S.C. § 1319(g)(6)(A)(iii) Preclusive Bar

■ The Court has concluded that the settlement agreement entered into by the Regional Board and the refineries and the CDO issued by the Regional Board were not actions taken under a state law "comparable" to 33 U.S.C. § 1319(g), and that the $2 million payment agreed to by Unocal, Exxon, and Shell was not a "penalty" assessed under such a law. As satisfaction of both of these criteria is a prerequisite for application of the preclusive bar against citizen suits under 33 U.S.C. § 1319(g)(6)(A)(iii), the Court rules that the § 1319(g)(6)(A)(iii) bar does not apply to preclude litigation of the instant citizen suit against Unocal.[17] Unocal's motion to dismiss the suit on this ground is therefore DENIED.

### 3. WHETHER NOTICE WAS TIMELY AND ADEQUATE

The citizen suit provision of the Clean Water Act specifies that no action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation...." 33 U.S.C. § 1365(b)(1)(A). In the suit against Unocal, plaintiff CBE gave notice of their intent to sue on November 9, 1993. Plaintiffs Save San Francisco Bay, San Francisco BayKeeper, The Bay Institute, Kalon Wofford, and Anthony Willis gave notice on January 18, 1994. Plaintiff Santa Clara Valley Audubon Society gave notice on March 1, 1994. The suit was filed on March 2, 1994.

In view of the above dates, only the notice given by plaintiff CBE was received more than sixty days prior to the filing of the suit on March 2, 1994. Thus, the suit satisfies the sixty-days notice requirement of 33 U.S.C. § 1365(b)(1)(A) only if CBE's notice was adequate.

### a. Validity and Effectiveness of Pre–Violation Notice

■ Unocal argues that CBE's notice was not valid and effective because it was given prior to December 12, 1993—the deadline by which Unocal was required to come into compliance with the final selenium limits specified in its NPDES permit. Although it was indisputable that Unocal would not be in compliance with the permit limits by the December 12, 1993 deadline, Unocal nonetheless argues that in order for notice of intent-to-sue to be valid and effective in a Clean Water Act citizen suit, the notice must be given *after*—rather than in anticipation of— the alleged violation. In support of this proposition, Unocal cites to language in the citizen suit provision that makes reference to "violations." *See* 33 U.S.C. § 1365(a)(1) ("[citizen suits may be brought] against any person ... who is alleged to be *in violation* of ... an effluent standard or limitation") (emphasis added); 33 U.S.C. § 1365(b)(1)(A) ("No action may be commenced ... prior to sixty days after the plaintiff has given notice of the *alleged violation....*") (emphasis add-

---

**17.** In a single sentence in a footnote in its reply memorandum, Unocal asserts that plaintiffs' citizen suit is also barred under 33 U.S.C. § 1319(g)(6)(A)(ii). In order for that provision to apply, the state must currently be "diligently prosecuting an action under a *State law* comparable to [33 U.S.C. § 1319(g)]" with respect to the same violation alleged in the citizen suit. The Court has already ruled above that the Regional Board's enforcement action against Unocal was taken under a state enforcement provision that is not comparable to 33 U.S.C. § 1319(g). Additionally, the Court rules that with the entry of the settlement agreement and the CDO, the Regional Board's enforcement action is no longer still being "prosecuted" within the meaning of 33 U.S.C. § 1319(g)(6)(A)(ii). Although those instruments impose various obligations on Unocal over the upcoming years, the prosecution of the action is for the present time completed and will only be renewed by the Board if Unocal fails to carry out its responsibilities under the settlement and CDO. As both the "being prosecuted" and "comparability" requirements of 33 U.S.C. § 1319(g)(6)(A)(ii) are thus not satisfied, the instant citizen suit is not barred under that provision.

ed). Unocal interprets this language as meaning that neither may a suit be initiated, nor valid notice of intent-to-sue given, until a violation has actually occurred.

The parties have cited no authority addressing precisely this issue. A somewhat related issue was addressed in *Chesapeake Bay Foundation, Inc. v. Bethlehem Steel Corp.,* 608 F.Supp. 440 (D.Md.1985). Although in that case the plaintiff's notice of its intent to sue was given after the date of the alleged violation, the plaintiff's suit also challenged an alleged continuing violation which, by definition, involved violations that had not yet occurred as of the date of notice. The court rejected the defendant's motion seeking dismissal of the continuing violation claims, ruling that the pre-violation notice of the claims satisfied the statutory notice requirement. *Id.* at 450–51.

Unocal has offered no compelling policy reasons why it would not make sense to construe 33 U.S.C. § 1365(b)(1)(A) as permitting pre-violation notice. Although the Supreme Court has stressed that the sixty-day notice requirement in citizen suit provisions of environmental statutes must be strictly enforced, *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), the Court has explained that the purpose for this requirement is to ensure that the defendant and/or government enforcement authorities are given some pre-suit notice so that they have an opportunity to address the matter *before* a lawsuit is filed. *Id.* at 30–31, 110 S.Ct. at 311. This purpose is fully served by permitting pre-violation notice. Indeed, such notice may actually *further* this goal, for it affords defendants and enforcement authorities an opportunity to attempt to avert or mitigate anticipated violations. In light of these considerations, and in the absence of any assistance from case law addressing the issue, the Court holds that notice of a citizen plaintiff's intent-to-sue filed in anticipation of—and thus prior to—a violation of the Clean Water Act counts as valid and effective notice for purposes of 33 U.S.C. § 1365(b)(1)(A).

**b. Inclusion of Plaintiffs Who Did Not Give Timely and Adequate Notice**

 Unocal argues as well that, regardless whether CBE's pre-violation notice was valid and effective, the other plaintiffs must be dismissed from the case for it is undisputed that their notice was not served more than sixty days prior to the filing of the suits. Plaintiffs counter that so long as at least one plaintiff has given defendant proper notice in accord with 33 U.S.C. § 1365(b)(1)(A), other plaintiffs who have not individually given the statutory sixty days notice may nonetheless permissibly join in the lawsuit. This Court recently addressed precisely this issue in the related case of *California Public Interest Research Group v. Shell Oil Co.,* Nos. C 92–4023 TEH, C 93–0622 TEH (N.D.Cal. Jan. 5, 1994). In *Shell* the Court wrote:

[A] number of courts have ruled that so long as defendants receive proper notice of the action from one plaintiff, additional plaintiffs can join without filing separate 60 day notices. These cases reason that where defendants have notice of the impending suit and an opportunity to resolve the matter short of litigation, there is no reason to exclude additional plaintiffs who later join the action. *See Klickitat County v. Columbia River Gorge Comm'n,* 770 F.Supp. 1419, 1424 (E.D.Wash.1991) ("The fact that other plaintiffs have joined in the litigation doesn't change the fact that the Forest Service was aware of the impending lawsuit and the basis for the claim."); *Student Public Interest Research Group ("PIRG") of New Jersey, Inc. v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1396 (D.N.J.1985) (citing lack of prejudice to defendants since they were put on notice as to the nature of the suit); *Student PIRG of New Jersey, Inc. v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1194 (D.N.J.1985) ("because one plaintiff served adequate notice ... defendant's right to adequate notice was preserved"); *South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 123–24 (D.S.C.1978).

[Defendant] contends that the Supreme Court implicitly overruled these cases in *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). As discussed above, *Hallstrom* holds that the 60 day pre-suit notice requirement is

not something that the courts can waive, but rather is a mandatory requirement. We should construe this holding, [defendant] argues, to require that *each individual plaintiff* named in the action must provide 60 days pre-suit notice. *Hallstrom,* however, never addresses this issue, since in that case, the defendants received *no* pre-suit notice at all. Moreover, *Hallstrom* focused on the statutory mandate that defendants be given some pre-suit notice so that they would have an opportunity to address the matter *before* a lawsuit was filed. The reasoning of the cases cited above is completely consistent with, and does not undercut, this rationale. We also note that at least one district court has continued to allow additional persons to join as plaintiffs after *Hallstrom.* *See Klickitat,* 770 F.Supp. at 1424.

*Id.,* Slip Op. at 6–7. By its terms, 33 U.S.C. § 1365(b)(1)(A) requires only that sixty days notice be given before a "[citizen] *action*" is commenced. The statute does not provide that every *plaintiff* must give such notice. Following its ruling in *Shell,* the Court holds that the 33 U.S.C. § 1365(b)(1)(A) requirement attaches to the lawsuit—*not* the plaintiff—and that the requirement is satisfied so long as at least one plaintiff has given statutorily adequate notice. As the Court has ruled above that pre-violation notice is statutorily adequate, the Court holds that the 33 U.S.C. § 1365(b)(1)(A) notice requirement is satisfied in this case. Unocal's motion to dismiss some or all of the plaintiffs for failure to satisfy the notice requirement is therefore DENIED.

For the reasons set forth above, the Court rejects each of the arguments raised by Unocal as to why plaintiffs' first cause of action should be dismissed. In light of these rulings, Unocal's motion to dismiss that claim is DENIED.

## C. SECOND CAUSE OF ACTION: VIOLATION OF WATER QUALITY STANDARD

Regarding the second cause of action, Unocal points out that the Ninth Circuit has recently ruled that water quality standards contained in NPDES permits—as distinct from effluent standards or limitations—are not enforceable in citizen suits under the Clean Water Act. *Northwest Environmental Advocates v. Portland,* 11 F.3d 900, 906–11 (9th Cir.1993). In their opposition papers, plaintiffs concede that their claim for violation of water quality standards fails to state a claim and should be dismissed. Accordingly, Unocal's motion to dismiss this claim is GRANTED.

## D. THIRD CAUSE OF ACTION: STATE UNFAIR BUSINESS PRACTICES CLAIM

Plaintiffs' third cause of action alleges that Unocal has, by not meeting the December 12, 1993 deadline set forth in its NPDES permit, engaged in an unfair business practice in violation of California Business & Professions Code § 17200 *et seq.* Unocal moves to dismiss this claim on two separate but related grounds. First, contending that plaintiffs' two federal law causes of action must both be dismissed, it argues that there consequently exists no pendent jurisdiction over the state law claim. Second, because an element of the state law claim, as pleaded by plaintiffs, is that defendant has violated the federal Clean Water Act, Unocal—contending that plaintiffs' federal Clean Water Act claims fail to state a claim—argues that the state law claim therefore fails as well for the same reasons. As the Court has ruled that plaintiffs' first federal cause of action does, in fact, state a claim, both of these arguments for dismissal must be rejected. Unocal's motion to dismiss this cause of action is therefore DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Court HEREBY ORDERS:

1. *Citizens for a Better Environment–California v. Exxon,* No. C 94–0713 TEH, is TRANSFERRED FORTHWITH from this Court to the U.S. District Court for the Eastern District of California;

2. Unocal's motion to dismiss plaintiffs' first cause of action is DENIED;

3. Unocal's motion to dismiss plaintiffs' second cause of action is GRANTED;

4. Unocal's motion to dismiss plaintiffs' third cause of action is DENIED;

5. Unocal's motion to dismiss plaintiffs Citizens for a Better Environment–California, Save San Francisco Bay, San Francisco BayKeeper, The Bay Institute, Santa Clara Valley Audubon Society, Kalon Wofford, and/or Anthony Willis is DENIED.

**IT IS SO ORDERED.**