**MOLOKAI CHAMBER OF COMMERCE, a Hawaii unincorporated association; Hoolehua Homesteaders Association, a Hawaii unincorporated association; and Hui Hoopakela Aina, a Hawaii unincorporated association, Plaintiffs,**

v.

**KUKUI (MOLOKAI), INC., a Hawaii corporation; Kajima Engineering and Construction, Inc., a Delaware corporation; and Kiewit Pacific Co., a California corporation, Defendants.**

Civ. No. 94–00530 DAE.

United States District Court, D. Hawaii.

May 23, 1995.

---

Denise E. Antolini, Lea O. Hong, Sierra Club Legal Defense Fund, Inc., Honolulu, HI, for Molokai Chamber of Commerce, Hoolehua Homesteaders Ass'n, Hui Hoopakele Aina.

Henry E. Klingeman, D. Scott MacKinnon, McCorriston Miho Miller & Mukai, Honolulu, HI, for Kukui (Molokai), Inc.

Mark B. Desmarais, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Kajima Engineering and Cons., Inc.

Charles W. Gall, Kobayashi Sugita & Goda, Honolulu, HI, for Kiewit Pacific Co.

## *ORDER DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND CONTINUING MOTIONS IN PART UNDER RULE 56(f)*

DAVID ALAN EZRA, District Judge.

The court heard Defendants' Motions on May 1, 1995. David Dezzani, Esq., Peter T. Kashiwa, Esq., Lisa W. Munger, Esq., and Mark B. Desmarais, Esq., appeared on the briefs or at the hearing on behalf of Defendant Kajima Engineering and Construction ("Kajima" ); David L. Monroy, Esq., Charles W. Gall, Esq., and Nathan H. Yoshimoto, Esq., appeared on the briefs or at the hearing on behalf of Defendant Kiewit Pacific Co. ("Kiewit"); Randall Schmitt, Esq., appeared on behalf of Defendant Kukui, Inc. ("Kukui"); Denise E. Antolini, Esq., Paul H. Achitoff, Esq., and Lea O. Hong, Esq., appeared on the briefs or at the hearing on behalf of Plaintiffs. After reviewing the motions and the supporting and opposing memoranda, the court DENIES in part and continues in part Defendants' Motions for Summary Judgment.

### BACKGROUND

This is a citizens' enforcement action brought by Plaintiffs Molokai Chamber of Commerce, Hoolehua Homesteaders Association, and Hui Hoopakela Aina, three unincorporated associations, under section 505 of the Water Pollution Control Act ("the Clean Water Act" or "the Act"), 33 U.S.C. §§ 1251–1386, against Defendants Kukui (Molokai), Inc. ("Kukui"), Kajima Engineering and Construction Inc. ("Kajima"), and Kiewit Pacific Co. ("Kiewit").

The complaint alleges that Defendants are in violation of the Clean Water Act and applicable state statutes as the result of: (1) their

failure to obtain a proper and timely storm water permit before and during construction; (2) their failure to comply with the state's general storm water permit conditions; and (3) their discharges of pollutants into the waters of the United States without a proper Clean Water Act storm water permit. Plaintiffs seek: (1) a declaratory judgment as to all of the violations; (2) issuance of an injunction until the terms of the permit are met; (3) issuance of an injunction requiring specific actions by Defendants and oversight by court-appointed experts; (4) imposition of civil penalties; and (5) attorney's fees and costs.

By their motions,[1] Defendants seek summary judgment, arguing that: (1) the absence of any ongoing violation at the time Plaintiffs filed their Complaint bars Plaintiffs' action; (2) diligent prosecution by state authorities bars Plaintiffs' citizen suit for civil penalties; and (3) work stoppage and permit issuance moot Plaintiffs' claims.

### I. The Regulatory Scheme

#### A. *The Clean Water Act*

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251–1386. The Act prohibits discharge of any pollutants into the nation's waters except when specifically authorized under the Act. 33 U.S.C. § 1311(a). Pursuant to section 402(a), National Pollutant Discharge Elimination System ("NPDES") permits can be issued to particular entities, allowing them to discharge limited amounts of pollutants into surface waters. 33 U.S.C. § 1342(a). Section 402(b) also permits each state to implement the Clean Water Act through its own permit program, so long as the program conforms to federal guidelines approved by the EPA administrator. 33 U.S.C. § 1342(b). The EPA administrator has authorized the Department of Health of Hawaii to issue and enforce discharge permits.

---

1. Defendants Kiewit and Kajima have filed motions for summary judgment. Defendant Kukui has joined in Kiewit's motion.

The Act subjects applicants for and holders of state NPDES permits to both state and federal enforcement actions for failure to comply with the permit requirements. 33 U.S.C. §§ 1319, 1342(b)(7). Where government enforcement is absent or inadequate, private citizens may bring civil actions under section 505 against any person alleged to be in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a)(1). Section 505 defines an effluent standard or limitation to include, *inter alia*, the discharge of any pollutant except as provided for in the Act and a violation of a permit or condition the Act. 33 U.S.C. § 1365(f)(1), (6). If a citizen prevails in an enforcement action, the court may enforce the effluent standard or limitation, order injunctive relief, and impose civil penalties. 33 U.S.C. § 1365(a).

In 1987, Congress amended the Clean Water Act to address the threat of pollution carried by storm water runoff into nearby surface waters. Under the amendments, discharges resulting from commercial or industrial activities which disturb more than five acres of land require a permit. Section 402(p), 33 U.S.C. § 1342(p).

### B. *Federal Regulations*

In 1990, the EPA issued final regulations under section 402(p), focusing in part upon construction activities. 55 Fed.Reg. 47990 (November 16, 1990). In issuing the regulations, the EPA noted the potential impact of construction activities upon surrounding surface water:

> Even a small amount of construction may have a significant negative impact on water quality in localized areas. Over a short period of time, construction sites can contribute more sediment to streams than previously deposited over several decades.

*Id.* at 47992. The EPA emphasized the crucial role of planning in order to prevent discharges of pollution from construction sites. *Id.* at 48034. The regulations require permit applications from potential dischargers of storm water to be submitted 90 days prior to the date on which the discharge is to commence. *Id.* at 48034. Under the regulations, after October 1, 1992, a NPDES permit is required for any discharge associated with industrial activity and encompassed "[c]onstruction activity including clearing, grading and excavation activities." 40 C.F.R. §§ 122.26(a)(1), 122.26(b)(14)(x).

Dischargers can comply with the regulations by applying for an individual permit, a group permit, or for coverage under a general permit. 40 C.F.R. § 122.26(c)(1). The regulations require the submission of several types of information in order "to determine whether to issue a permit. . . ." 40 C.F.R. § 122.26(c)(1)(v). Under a general permitting program, the state adopts a general permit in the form of a regulation covering large categories of dischargers who do not generally need specialized permits. For example, Hawaii regulations define "general permit" as "a rule or document that authorizes a category of discharges into state waters from a category of sources within a geographical area." H.A.R. § 11–55–34. Dischargers seeking coverage under a general permit must submit a notice of intent ("NOI") to be covered by the general permit. 40 C.F.R. § 122.28(b)(2).

Under the EPA regulations, general permits must "specify the deadlines for submitting notices of intent to be covered and the date(s) when a discharger is authorized to discharge under the permit." 40 C.F.R. § 122.28(b)(2)(iii). At the state's election, general permits may specify that the discharger is authorized to discharge in accordance with the general permit "either upon receipt of notice of intent by the Director, after a waiting period specified in the general permit, or upon receipt of notification of inclusion by the Director." 40 C.F.R. § 122.28(b)(2)(iv).

### C. *State Implementation*

On October 29, 1992, Hawaii DOH amended its Water Pollution Control regulations to implement the new federal storm water permitting requirements. H.A.R. 11–55. Like all state NPDES permit programs, state-issued general permits must at least meet the federal requirements contained in 40 C.F.R. § 122.28. H.A.R. § 11–55–34.01. The DOH regulations include general permit administrative rules and six general permits. H.A.R. § 11–55–34, et seq. Under the rules,

dischargers must comply with "Standard General Permit Conditions" specified in Appendix A, imposing the same obligations on the permittee as the EPA permit. 57 Fed. Reg. 44412, 22. Appendix C provides a general permit for storm water discharges associated with construction activity.

A person seeking coverage under the general permit for discharge associated with construction "shall comply with the NOI requirements of § 11–55–34.08." H.A.R. 11–55, Appendix C, § 3(a). In order to be covered under a general permit, an applicant must submit a NOI "no later than ninety calendar days before the start of activities or discharges." H.A.R. § 11–55–34.08(j). Appendix C incorporates the 90–day requirement:

> The developer or operator, normally the general contractor, of a proposed site with storm water discharges associated with a construction activity shall submit a complete NOI no less than 90 days before the proposed construction starting date in order to be covered under this general permit.

*Id.* at § 1(b). After receipt of a complete NOI:

> the director shall notify the NOI submitter in writing whether the proposed activity or discharge[s] is or are covered under a general permit or an individual permit application is required. Notification is complete upon mailing or facsimile transmission.

H.A.R. § 11–55–34.09(a). The general permit for discharge associated with construc-

tion provides that it covers discharges "for which a complete Notice of Intent (NOI) has been submitted and a Notice of General Permit Coverage (NGPC) has been issued by the director." H.A.R. § 11–55, Appendix C, § 1(b). The NOI must include a "Best Management Plan," which must meet the requirements of the regulations. *Id.,* Appendix C, § 5(b), (d). "The 90–day period, as specified in subsection 1(b), shall not begin counting until the date the plan is deemed to be satisfied by the director." *Id.,* Appendix C, § 5(c).

## II. The Molokai Pipeline Project

The Molokai Pipeline Project is an approximately nine-mile-long water transmission pipeline being constructed by Defendants on the central and west portions of the Island of Molokai, from the Kualapu'u area to Mahana/Maunaloa.[2] Kukui is the owner of the pipeline project; Kajima is the general contractor on the project; and Kiewit is the subcontractor on the project.

On August 17, 1993, Kiewit filed a Notice of Intent To Be Covered Under General Permit ("NOI") with the State Department of Health ("DOH") for coverage under the State's NPDES storm water general permit. The DOH rejected the NOI because only the owner or someone authorized by the owner of the project could file the NOI. On August 20, 1993, Kukui wrote a letter to DOH stating that Kukui had given authorization to Kiewit "to secure the NPDES permit required for the construction of the Molokai Potable Water System—Phase I." Letter,

**2.** The court takes these facts primarily from Defendants' Concise Statements of Fact and Plaintiffs' Joint Opposition to Defendants' Concise Statements, filed pursuant to Local Rule 220–10. Where the court does not note disagreement between the parties, the facts are undisputed.

The court notes that on May 19, 1995, it denied from the bench a motion by Defendants to strike certain declarations submitted by Plaintiffs. Plaintiffs had timely filed copies of the declarations of Walter Ritte, Jr. and DeGray Vanderbilt. The day before the hearing on these summary judgment motions, Plaintiffs filed the original declarations and the declaration of Peter Thomson, which describes the taking of a videotape attached to Plaintiffs' timely opposition. Defendants moved to strike these declarations because they were not timely served and because they lacked the "under penalty of perjury" language

required for unsworn declarations under 28 U.S.C. § 1746. Plaintiffs filed supplemental declarations in which each declarant places himself under penalty of perjury. The court found no prejudice to Defendants, who had knowledge of the contents of the declarations and the videotape. The court considered these declarations at oral argument and now does so in ruling on these motions. *See Travelers Ins. Co. v. Liljeberg Enterprises,* 7 F.3d 1203, 1207 (5th Cir.1993) (when a party submits an unexecuted affidavit, with subsequent service of an executed affidavit, the subsequent affidavit may be acceptable if the opposing party has ample notice of the contents of the affidavit); *United States v. Gritz Bros.,* 155 F.R.D. 639, 644 (E.D.Wis.1994) (where corrected declaration was filed court denied motion to strike unsworn declaration which did not conform to 28 U.S.C. § 1746).

attached as Exhibit "2" to Plaintiffs' Joint Opposition to Defendants' Concise Statement of Facts ("Fact Opposition").

On August 24, 1993, DOH received a revised NOI for the Molokai Pipeline Project, which identified the project owner as Kukui and the project operator as Kiewit. *See* NOI, attached as Exhibit "3" to Plaintiffs' Fact Opposition. The NOI identifies September 13, 1993 as the date for beginning construction.

On August 31, 1993, DOH wrote to Mr. Hedani, stating that DOH "acknowledges receipt of your Notice of Intent," that a file number had been assigned, and that "[t]he Department *is processing your NPDES general permit coverage* as expeditiously as possible. You will be notified if additional information is necessary to complete the processing of your coverage." Letter, attached as Exhibit "4" to Plaintiffs' Fact Opposition (emphasis added). While Defendants state that their NOI was "accepted by DOH," Plaintiffs correctly indicate that the letter from DOH did not state that the NOI was "accepted" or that Defendants could commence the project before DOH issued a Notice of General Permit Coverage ("NGPC").

In October 1993, Defendants began work on the project, including stockpiling materials and grading access roads. Plaintiffs and Defendants dispute Defendants' statement that, in October 1993, Kiewit installed erosion control measures at the project site.[3]

On January 25, 1994, the County of Maui issued a Notice of Violation ("NOV") for violations of the County grading permit. *See* NOV, attached as Exhibit "5" to Plaintiffs' Fact Opposition. The Notice directs Kukui and Kajima to "Stop Work!" on that day, to make corrections immediately, and to complete all work on corrections by February 11, 1994. *Id.* Plaintiffs dispute Kiewit's statement that, "[a]s a result of the violation, the project was shut down." Defendant Kiewit's Concise Statement, at ¶ 4.[4] At this time, excavation had occurred at several areas.

On January 28, 1994, DOH inspector Watson Okubo inspected the project. *See* Okubo's Report, attached as Exhibit "6" to Plaintiffs' Fact Opposition. Okubo reported "a total absence of erosion controls" at the site and stated that lack of erosion controls could cause a large rainfall to "carry silt down Waiahewahewa and Manawainui Gulches and possibly into the ocean. This would be an additional violation of our regulations." *Id.* Okubo also stated:

> Assuming that the pipeline will be 9–miles long and given a conservative width of 10 feet, the total project area amounts to 10.9 acres. Anything over 5 acres requires an NPDES permit (Storm Water Discharge). Therefore, the owner/developer Kukui (Molokai), Inc. is in violation because they do not have a permit at this time.

*Id.* at 2. Plaintiffs dispute Kiewit's statement that, "[f]ollowing the January 28, 1994 inspection by DOH, Kiewit immediately stopped all work except as necessary to install erosion control measures in the form of additional silt fences and the earthwork necessary to create silt settling ponds and catch basins," and that "erosion control measures were completely installed before the end of February 1994." Defendant Kiewit's Concise Statement, at ¶ 6 (citing Affidavit of Ray Backen, ¶¶ 11, 12).[5]

On February 23, 1994, DOH issued to Kukui a "Notice of Apparent Violation" (emphasis added) pursuant to H.R.S. § 342D–50(a)

**3.** Defendants rely for the support of this contention upon the Affidavit of Ray Backen. *See* Affidavit of Ray Backen, attached to Defendant Kiewit's Concise Statement, at ¶ 8. Plaintiffs point as contrary evidence to photographs purportedly taken on January 28, 1994 of certain major portions of the project that purportedly show *no* erosion control measures, such as silt fences, straw bales, or mulching. *See* Declaration of DeGray Vanderbilt, Attached as Exhibit "18" to Plaintiffs' Fact Opposition.

**4.** Plaintiffs attach a videotape filmed on January 31, 1995 to their Fact Opposition, purportedly indicating that Defendants continued work on that date. Videotape, attached as Exhibit "17" to Plaintiffs' Fact Opposition.

**5.** Plaintiffs submit that the memoranda from two state employees who examined the site, as well as photographs and a videotape, indicate either no erosion control measures or ineffective measures. *See* Plaintiffs' Fact Opposition, at ¶ 13, and Exhibits "10," "16"—"20," attached to Plaintiffs' Fact Opposition.

and H.A.R. Chapter 55, Appendix C.1.(a). *See* Notice, attached as Exhibit "8" to Plaintiffs' Fact Opposition; Exhibit "H" to Defendant Kiewit's Concise Statement. The DOH letter stated that "a review of the Department of Health's files show that no NOI application was submitted for this project." *Id.* at 1. Plaintiffs agree with Kiewit that DOH's statement that "no NOI had been submitted for this [P]roject" appears to be erroneous, unless DOH was referring to the sufficiency of the NOI. The letter further stated that Kukui was "to take appropriate action to prevent any further recurrence," and warned:

> Failure to [take action to prevent further recurrence] may lead to *more stringent enforcement action* by the Department. Section 342D–11, H.R.S., provides for penalties of up to $10,000 per day for each violation.

*Id.* at 2 (emphasis added). DOH asked Kukui to "submit a report of your action within 20 days from the date of this notice." *Id.*

Defendants state that as part of its enforcement action the DOH "effectively shut down the project and refused to allow the project to continue until such time that the General Permit Coverage was issued." Defendant Kiewit's Concise Statement, at ¶ 9 (citing Affidavit of Ray Backen ¶ 13). Plaintiffs dispute Kiewit's statement that the DOH effectively shut down the project and that the DOH letter constituted an "enforcement action" that could bar a citizen's suit pursuant to 33 U.S.C. § 1319(g)(6)(A).

On February 28, 1994, State Department of Land and Natural Resources field agent Bill Puleloa observed extensive runoff, heavily stained with top soil, silt, and other debris, running from the project site into the ocean. This resulted from rains during the second week in February. The water reached the shoreline approximately four miles away and breached another mile of reef flat, spilling into the open waters of Kalohi Channel itself. Puleloa noted that the turbidity of the runoff

appeared particularly severe because of the exposed topography caused by the pipe laying excavation project. *See* Letter, attached as Exhibit "7" to Plaintiffs' Fact Opposition.

On May 6, 1994, DOH issued a letter to Kukui regarding the "Incomplete Notice of Intent (NOI) Submittal." Letter, attached to Plaintiffs' Fact Opposition as Exhibit "9," and to Defendant Kiewit's Concise Statement as Exhibit "I." DOH found four prerequisites lacking: (1) Maui County approved grading plan; (2) Maui County approved "sediment and erosion control plan"; (3) Copy of permits approving plans from Maui County Department of Public Works; and (4) Detailed description of installation and location of silt fences being used. *Id.* DOH added that:

> [b]ecause construction has already begun on the described project, the Department of Health requires that the above mentioned plans be approved by the governing county and received by the Department prior to permit issuance. *Until your NOI is complete, the Department cannot proceed with the processing of your NOI* for an NPDES permit to discharge storm water associated with construction activities into waters of the state.

*Id.* (emphasis added). Kiewit states and Plaintiffs dispute that in May 1994, "the project remained shut down." [6]

On May 10, 1994, Plaintiffs sent to Defendants and others a "60–Day Notice Of Intent To Sue." Defendants state that at the time of the 60–day notice: "(1) the Project had been completely shut down for three months, (2) the DOH had begun enforcement action against Defendants three months earlier, (3) the DOH had requested and was reviewing information related to the NOI and General Permit requirements, (4) Defendants were working with the County of Maui to address their concerns." Defendant Kiewit's Concise Statement of Facts, at ¶ 11 (citing Affidavit of Ray Backen). Plaintiffs dispute all of these four points.[7]

---

6. Plaintiffs offer no evidence on this issue at this time, but seek to conduct further discovery if the court deems it to be a material fact.

7. Plaintiffs agree only that DOH "had requested" information from Defendants related to the NOI. As to the other statements, Plaintiffs assert that they are not material, that Plaintiffs need further discovery if these statements are deemed materi-

In a June 2, 1994 letter to DOH, Kajima responded to DOH's May 6, 1994 letter and requested that DOH "complete the processing of the NOI for an NPDES permit." Letter, attached as Exhibit "12" to Plaintiffs' Fact Opposition. On June 17, 1994, Plaintiffs petitioned DOH for a declaratory ruling to require Defendants to obtain an "individual" storm water permit for the project instead of a "general" storm water permit. On July 8, 1994, DOH Deputy Director, Dr. Bruce Anderson, responded to Plaintiffs' May 10, 1994 notice of intent to sue and Plaintiffs' June 17, 1994 petition. Letter, attached as Exhibit "14" to Plaintiffs' Fact Opposition. Anderson stated that DOH would be issuing a formal Notice and Finding of Violation and Order (NFVO) to Kukui "for causing the discharge of storm water from their Molokai Pipeline Project to State waters without any authorization from DOH," but that "[t]he exact scope of the NFVO is still under review." *Id.* In addition, DOH agreed that their rules "require submittal of a Notice of Intent (NOI) to be covered by a general permit *at least 90 days before the proposed construction date*" but stated that "[i]n cases where DOH has issued a NGPC less than 90 days after receiving the NOI, DOH has not sought to have the NOI submitter wait a full 90 days before starting construction," and "[i]n practice, DOH has also accepted and processed NOIs after construction was suspended." *Id.* The letter also stated: "Regarding whether an individual permit is required, the DOH has reviewed your petition, its files, and HAR § 11–54–34.05, especially § 11–54–34.05(7). We rule that an individual [NPDES] permit is not required." *Id.* at 2. Finally, DOH also stated that it would hold an informational hearing during the week of August 15, 1994, to "give our department an opportunity to see if any special conditions are appropriate for any general permit coverage that may issue." *Id.*

On July 11, 1994, Plaintiffs filed this lawsuit, 62 days after its notice of intent to sue was issued. After holding a meeting on Molokai on October 24, 1994, the DOH issued a Notice of General Permit Coverage (NGPC) to Defendant Kukui on December 27, 1994.

al, and that they are not supported by Backen's

Defendants assert that, as of the date they filed their Concise Statements, work has not resumed on the Project. Defendant Kiewit's Concise Statement, at ¶ 18 (citing Affidavit of Ray Backen, at ¶ 22). Plaintiffs dispute this statement as immaterial and also assert that they have not completed discovery on the issue.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552–53.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

personal knowledge.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. at 2513. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: whether the evidence presents a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

I. Subject Matter Jurisdiction: Ongoing Violations

Under 33 U.S.C. § 1365, "any citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation" of the Clean Water Act. In *Gwaltney v. Chesapeake Bay Found.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Supreme Court held that citizen plaintiffs must allege "a state of either continuous or intermittent violation" in order to establish federal jurisdiction under section 505(a). 484 U.S. at 57, 108 S.Ct. at 381. Defendants wishing to challenge plaintiffs' allegations of continuing violations must "move for summary judgment and demonstrate that 'the allegations were sham and raised no genuine issue of fact.'" *Sierra Club v. Union Oil Co. of California,* 853 F.2d 667, 669 (9th Cir.1988) (quoting *Gwaltney,* 484 U.S. at 66, 108 S.Ct. at 386). Plaintiffs bear the ultimate burden of establishing ongoing violations:

> (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

*Id.* at 671 (citation omitted). In determining the likelihood of recurrence, a court must find that there is "no real likelihood of repetition." *Id.* This determination may rest upon a finding that remedial actions taken to cure the violations "completely eradicated" the risk of defendants' continued violations. *Id.* (citation omitted).

Defendants argue that there were no ongoing violations of the Clean Water Act at the time Plaintiffs filed their complaint on July 11, 1994, emphasizing that construction on the project had been completely halted. Plaintiffs respond that: (1) no permit had issued, creating continuing violations; (2) erosion controls were inadequate to stop rainfall and resulting runoff in violation of state and federal law; and (3) more discovery is necessary in order to determine the extent of erosion control and whether construction had truly ceased.

The crux of Plaintiffs' argument is that, when a project lacks a permit, any construction is in continual violation until a permit is obtained, even if construction is halted. Defendants respond that a Notice of General Permit Coverage (NGPC) was not required for construction to begin, and that even if a NGPC was required, finding continuing violations when construction had ceased would put defendants in an untenable position of breaking the law whether they stopped or continued construction. Defendants admit that construction began in October 1993, before a NGPC had issued and, indeed, before 90 days had elapsed from the filing of their NOI. The parties agree that construction continued until at least January 28, 1994.

These arguments raise three separate issues: (1) whether a permit was required for Defendants' construction activities on July 11, 1994; (2) whether lack of a permit results in continual, daily violations sufficiently "ongoing" to trigger this court's jurisdiction over a citizen suit; and (3) whether Defendants' failure to have a permit in place resulted in continuing violations even after construction was halted and erosion controls were put in place.

### A. *Permit Requirement*

█ Concerning the requirement of a NGPC as a prerequisite to construction, the parties do not dispute the fact that the construction activities at issue fall under the ambit of section 402(p) of the Clean Water Act, which requires a permit for such discharges. Therefore, under the regulatory scheme developed under section 402(p), such construction activities resulting in discharges are either covered by a permit or in violation of the Act. Because federal regulations allow the state to condition coverage under a general permit "either upon receipt of notice of intent by the Director, after a waiting period specified in the general permit, or upon receipt of notification of inclusion by the Director," Defendants' contention that they are covered hinges on reading the relevant Hawaii regulations to condition coverage merely upon "receipt of notice of intent by the Director" or "after a waiting period. . . ." 40 C.F.R. § 122.28(b)(2)(iv).

A careful study of the statutory scheme convinces this court that H.A.R. § 11–55 requires the issuance of a Notice of General Permit Coverage (NGPC) before construction may legally commence. The general permit requirements for discharges associated with construction activity explicitly condition coverage under such a permit on the issuance of notice by the director. H.A.R. § 11–55, Appendix C, § 1(b). This general permit covers discharges "for which a complete Notice of Intent (NOI) has been submitted *and* a Notice of General Permit Coverage (NGPC) has been issued by the di-

rector." H.A.R. § 11–55, Appendix C, § 1(b) (emphasis added). In order to be covered under a general permit, an applicant must submit a NOI "no later than ninety calendar days before the start of activities or discharges." H.A.R. § 11–55–34.08(j) (emphasis added).[8]

The general regulations signal the import of this notice from the director by their singular specificity regarding the effective date of the notice, stating that such notice shall be effective on the date it is faxed or mailed. H.A.R. § 11–55–34.09(a). After receipt of a complete NOI, "the director shall notify the NOI submitter in writing whether the *proposed* activity or discharge[s] is or are covered under a general permit or an individual permit application is required." H.A.R. § 11–55–34.09(a) (emphasis added). The definition of the "Notice of Intent" states that it is a notification that "a person *seeks* coverage." H.A.R. § 11–55–34. Finally, the NGPC issued on December 27, 1994 specifies that it will "take effect on the date of this notice." *See* NGPC, attached as Exhibit "N" to Defendant Kiewit's Concise Statement of Facts, at 5.

█ Under the Hawaii regulations, the only reasonable alternative to this interpretation is that general permit coverage begins 90 days after the filing of a NOI. However, even under this interpretation, the NOI in question must be one whose "Best Management Plan" ("BMP") satisfies the director. H.A.R. § 11–55, Appendix C, § 5(b), (c), (d). In this case, because there was no indication at the time Plaintiffs filed the complaint that Defendants' BMP had been accepted, the 90–day counting period would not have run, regardless of the effect its running would have had. Therefore, while the court finds that the regulations condition coverage upon receipt of a NGPC from the director, the court also finds that under either interpretation of Hawaii's administrative rules, Defendants' project lacked permit coverage when Plaintiffs filed their complaint.

---

**8.** This 90–day period, as specified in subsection 1(b), does not begin until the date the "Best Management Plan" required under section 5 is

"deemed to be satisfied by the director." H.A.R. 55–11, Appendix C, § 5(c).

### B. *Continuing Nature of Violation*

■ Defendants were therefore in violation of the Act because they lacked a permit. They argue, however, that such a violation is not of the ongoing nature necessary to trigger this court's jurisdiction over a citizen suit: "Taking [Plaintiffs] logic to an extreme, Plaintiffs would argue a continuing violation would occur even if one shovel of dirt is displaced at the commencement of construction. . . ." Kajima's Reply Memorandum, at 2.

In *Gwaltney,* the Supreme Court interpreted the language of the Clean Water Act to require *present* violations, emphasizing its similarity to other statutes authorizing only prospective relief. 484 U.S. at 57, 108 S.Ct. at 381 (citing, Clean Air Act, 42 U.S.C. § 7604) (further citations omitted). Noting the statutory scheme providing for notice before filing a citizen's suit, the court concluded that the Clean Water Act was such a forward looking statute: "The harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Id.* at 59, 108 S.Ct. at 382. "[Section] 505 does not permit citizen suits for wholly past violations. . . ." *Id.* at 64, 108 S.Ct. at 385.

■ Operating without a permit is a present, not a past violation. *See Carr v. Alta Verde Industries, Inc.,* 931 F.2d 1055, 1062 (5th Cir.1991) (A discharger operating without a permit "remains in a continuing state of violation until it either obtains a permit or no longer meets the definition of a point source."). Justice Scalia clarified the basis for this conclusion in his concurrence in *Gwaltney,* where he explained:

> The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act—the opposite of a state of compliance. . . . When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation.

484 U.S. at 69, 108 S.Ct. at 387 (Scalia J., concurring).

In contrast, to take Defendants' logic to its extreme, the failure to obtain permit coverage would constitute a single violation on the day construction was begun, and that day only. This would preclude citizen suits to bring dischargers into compliance with permitting requirements because the provision for 60 days notice for citizen suits contemplates violations lasting over a period of time. Moreover, for this court to hold that only the actual violation of permit requirements, and not the failure to obtain permit coverage itself, can constitute an ongoing violation, would turn the purpose of the Act and its provision for citizen enforcement on its head: citizens could bring suits to stop violations of permit requirements by a covered discharger, but they could not bring suits against a discharger who had not obtained coverage at all. Defendants offer no interpretation of the Act or regulations that could support such a result, in fact focusing their arguments more narrowly on their contention that violation cannot continue once construction has stopped.

### C. *Impact of Construction Cessation and Erosion Control*

■ Defendants argue that even though they began construction without a permit, they stopped construction and thus ended their violation.[9] Defendants apparently believe that on the day construction ceases, the violations become "wholly past" under the *Gwaltney* doctrine. The problem with this argument is that it loses sight of the focus of the Act: the water. It fails to account for the interplay of rainwater and the construction site, an interaction that the Act and its regulatory scheme is intended to manage. It is the discharge of water without permit coverage that violates the Act, not the construction activity itself.

■ The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source, . . . ." 33 U.S.C. § 1362(12). Regulations include

---

**9.** Plaintiffs argue that the violation continues and dispute the fact that construction had ceased. Because the court agrees with Plaintiffs on the former point, it need not reach the latter.

under this term "additions of pollutants into the waters of the United States from surface runoff which is collected or channelled by man; ...." 40 C.F.R. § 122.2. Pollutants include "dredged soil." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2. Point sources include any "discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14); 40 C.F.R. § 122.2, "including but not limited to, any pipe, ditch, channel, tunnel, conduit, [or] well...." From these definitions it is clear that, once a person creates a conduit for pollutants, no further act is necessary to violate the act, regardless of whether the conduit meets the technical permit requirements. If permit coverage is required for that conduit and is not obtained, the conduit is in continual violation of the act. Notably, neither the Act nor the regulations promulgated under it contain an intent requirement for such violations. *See United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979).

A clear example of this distinction exists when one contrasts earthwork construction activity with the operation of a hypothetical chemical plant near a river. Assume that when the plant stops operations, the pollutant ceases to flow into the river. The violations before the plant closed are clearly past violations. No future violation is possible unless the plant restarts its operations and resumes its discharge into the river. In contrast, the digging of the ditch creates circumstances where the pollutant, i.e., runoff continues to discharge into waters of the state each time it rains and therefore continues to pollute until the violative earthwork construction is corrected.

Thus, for Defendants to show that they were not in violation of the Act, they would have to eliminate all issues of fact concerning whether *any* pollutants were discharged during the period in which Plaintiffs filed their Complaint. Plaintiffs submit a letter from Field Agent Bill Puleloa which recounts an "extensive flow" of water in Manawainui Gulch. *See* Letter from Field Agent Bill Puleloa, attached as Exhibit "7" to Plaintiffs' Fact Opposition. Puleloa states that the water reached the shoreline and was visible there on February 17, 1994. *Id.* Puleloa

also states that "[h]istorically, runoff from the Manawainui Gulch has always been muddy because of close by agricultural activities." *Id.* Plaintiffs also submit other evidence of runoff prior to March 1994.

Defendants' Affidavits do not erase all factual disputes regarding whether erosion control measures undertaken by Defendants eliminated all potential discharges. The Affidavit of John Schneider, the Project Manager of Defendant Kajima, does not demonstrate the *complete* absence of any discharges. *See* Schneider Affidavit, attached to Defendant Kajima's Motion. Schneider indicates that a dam was built across Manawainui Gulch at an unspecified date, *id.* at ¶ 19, and that sandbags were "subsequently installed" at Manawainui Gulch in March 1994. *Id.* at ¶¶ 21. Schneider states that the dam has not been breached and that subsequent inspections at unspecified dates "indicated that the sandbags have yet to be touched by any water." *Id.* at ¶ 20. In lining up the Schneider Affidavit and the Puleloa letter, the court would have to find either that the dam was built after February 17, 1994, or that the letter conflicts with the Schneider Affidavit in its description of the effectiveness of the dam. Apparently, there has always been some runoff from the gulch, and Defendants are now submitting that the dam has stopped this runoff completely.

Indeed, Schneider's statements do not indicate to the court that *nowhere* along the construction site did any storm water runoff carry silt into any of the nation's waters, as it apparently did in February 1994. Schneider indicates that the only construction at Waiahewahewa Gulch consisted of certain erosion control measures. *Id.* at ¶ 11. However, the Declaration of Walter Ritte, Jr., submitted by Plaintiffs, states that Defendants have bulldozed roads along the sides of Waiahewahewa Gulch, "where erosion is already a problem." Affidavit of Walter Ritte, Jr., filed April 28, 1995, at ¶ 3.

The court notes that the evidence submitted by Plaintiffs consist entirely of observations made before March 1994, the date Defendants allege that they added certain erosion control measures. While Plaintiffs have not submitted evidence of discharges occur-

ring after March 1994, neither have Defendants submitted sufficient evidence to satisfy this court that no discharge occurred after March 1994. *See* 33 U.S.C. § 1362(12) (a discharge is "*any* addition of any pollutant. . . .") Because Defendants had no permit in place, only such evidence could eliminate the continuing nature of their violations under *Gwaltney* and *Sierra Club v. Union Oil.* "If the defendant fails to convince the court that there are no genuine issues of fact after the plaintiff offers evidence to support the allegations of ongoing noncompliance, the case goes to trial on the merits." *Sierra Club v. Union Oil,* 853 F.2d at 669.

On these motions for summary judgment, the court does not find that Defendants have proven that Plaintiffs' allegations "were sham and raised no issue of fact." *Id.* Because of the continuing nature of the permit coverage violation discussed above, only the elimination of all factual disputes concerning the *complete absence* of any discharge or any chance of future discharge (under storm conditions, for example) would suffice to carry Defendants' summary judgment burden here. They have not met this burden.

In summary, violative discharges continue until Defendants obtain permit coverage *and* bring themselves into compliance with the permit requirements. Without permit coverage, discharges violate the Act; with permit coverage and compliance, they do not. The undisputed facts show Defendants had begun construction, requiring permit coverage, before Plaintiffs filed their complaint. Applying this court's interpretation of the Hawaii regulations to the facts, those undisputed facts also show that Defendants did not have permit coverage at the time Plaintiffs filed their complaint on July 11, 1994. Even if construction had ceased and erosion control measures were in place, Defendants were in

violation of the Act on July 11, 1994, failing proof of a complete absence of storm run-off.[10] For these reasons, the court finds that Defendants' violation and responsibility are continuous until compliance, and bringing about such compliance is exactly what the citizen suits under the Act are about. *Gwaltney,* 484 U.S. at 60 n. 3, 108 S.Ct. at 382 n. 3 ("citizen suit is . . . an action for compliance. . . ."). Accordingly, Defendants have not met *Gwaltney*'s requirement of showing Plaintiffs' allegations continuing violations to be shams, and as a result this court has subject matter jurisdiction over this citizen suit. While at trial Defendants may be able to prove the complete absence of discharges, they have not done so here. Therefore, the court DENIES Defendants' Motions for Summary Judgment on this issue.

## II. Diligent Prosecution

Defendants claim that state enforcement action bars a citizen action for penalties here. Section 505 of the Act authorizes private enforcement of the Act through citizen lawsuits. Both the Congress and the courts of the United States have regarded citizen suits under the Act to be an integral part of its overall enforcement scheme.[11] The Ninth Circuit has recognized that Congress intended citizen suits to be "handled liberally, because they perform an important public function." *Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517 (9th Cir.1987). Further, "citizens should be unconstrained to bring these actions, and . . . courts should not hesitate to consider them." *Id.* (citations omitted).

Defendants argue, however, that Congress intended citizen suits to be subordinate to agency enforcement, and that, in the instant case, Plaintiffs' suit is barred by the DOH Notice of Apparent Noncompliance to Defen-

---

**10.** For this reason, whether construction had in fact ceased on July 11, 1994 is not a fact material to the denial of Defendants' Motions for Summary Judgment on this issue.

**11.** The statute provides, in pertinent part, as follows:

Except as provided in subsection (b) of this section and section 309(g)(6) [33 U.S.C. § 1319(g)(6)], any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. . . .

33 U.S.C. § 1365(a).

dants. The Supreme Court has stated that the "bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney,* 484 U.S. at 60, 108 S.Ct. at 383 (quoting S.Rep. No. 92–414, at 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1482 (1973)). The Court held citizen suits to be proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Id.* (emphasis in the original).

In arguing that this suit is barred, Defendants rely upon section 309(g) of the Act, which provides, in pertinent part, as follows:

> Action taken by the Administrator or Secretary ... under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this Act; except that any violation—
>
> (i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,
>
> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or
>
> (iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,
>
> shall not be the subject of a civil penalty action under subsection (d) of this section or section 311(b) of this title or section 1365 of this title [33 U.S.C. § 1321(b) or 1365].

33 U.S.C. § 1319(g)(6)(A). Under this provision of the Act, private citizens are precluded from bringing a particular civil penalty action when the EPA is diligently prosecuting an administrative penalty action for the same violations, or when a state is diligently prosecuting an action under a state law "comparable" to section 1319(g). Section 1319(g) deals exclusively with administrative penalties.

### A. Comparability: Penalties

■ Courts have differed over whether section 1319(g)(6)(A) precludes citizen suits where the state enforcement action does not seek damages. *Compare North and South Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552 (1st Cir.1991) (holding state action comparable even though it did not seek monetary sanction) *and Sierra Club v. Colorado Refining Co.,* 852 F.Supp. 1476, 1485 (D.Colo.1994) (same) *with Citizens for a Better Environment v. Union Oil Co.,* 861 F.Supp. 889, 906 (N.D.Cal.1994) (holding that assessment of state enforcement comparability should be similar to EPA enforcement comparability, which requires penalties). In this circuit, there is no doubt that *federal* enforcement must seek penalties in order to bar a citizen suit under section 1319(g)(6)(A)(ii). *Wash. PIRG v. Pendleton Woolen Mills,* 11 F.3d 883, 885 (9th Cir.1993) ("We are unaware of any legislative history demonstrating a congressional intent to extend the bar on citizen suits created ... to a context other than an administrative penalty action.").

In reading the plain language of the statute as applied to state enforcement actions, the court can see only one result, that the state enforcement, like the federal, must seek penalties in order to bar citizen suits. Each of the three conditions for barring citizen suits uses the phrase "under this subsection." No court has interpreted this language to reference any subsection besides 1319(g), which concerns administrative penalty actions. Sections 1319(g)(6)(A)(i) and (ii) use almost identical language, the only difference being the governmental unit, federal or state, commencing that action. Therefore, section 1319(g)(6)(A)(ii) requires that the state commence an action under a state law comparable with subsection 1319(g), which provides for administrative penalties. This interpretation squares with the bar itself, which is only to "civil *penalty* action[s] under ... section 1365." 33 U.S.C. § 1319(g)(6)(A) (emphasis added). Taken in this light, the bar has a simple and straightforward effect: when the government is seeking penalties, citizens may not.

In comparing state enforcement, some courts have looked to the entire scheme of

available remedies under state law and not to the specific provisions under which the enforcement action at issue is brought. *Scituate*, 949 F.2d at 555–56. However, the language of the statute convinces this court that in comparing the state enforcement, it must look to the particular statutory provision under which the enforcement action at issue is brought. *See Citizens for a Better Environment*, 861 F.Supp. at 906. This conclusion rests in part on the specificity with which the Act describes the basis for comparison, "this subsection" being section 1319(g) only. The conclusion also rests on the anomalous outcomes that would result under the alternative.

In *Citizens*, the district court was unpersuaded by *Scituate*, where the First Circuit applied the comparability requirement of section 1319(g)(6)(A)(ii) to the state scheme as a whole and concluded that even a state action not seeking penalties could bar a citizen suit. 861 F.Supp. at 907. The court reasoned that such an interpretation would grant state enforcement action much "broader preclusive effects against citizen suits than EPA actions." *Id.* The court further stated:

> Any type of state enforcement action would trigger the preclusive bar so long as *somewhere* in the state's enforcement scheme there existed provision comparable to 33 U.S.C. § 1319(g). Penalties imposed under enforcement provisions not affording procedural safeguards comparable to 33 U.S.C. § 1319(g) would bar citizen suits.... Although the federal enforcement scheme, of course, contains all of these [less procedurally protective] features, federal enforcement actions trigger the preclusive bar only where they are taken under one particular enforcement provision: 33 U.S.C. § 1319(g).

*Id.* Finally, as the district court in *Citizens* noted, its reading of the statute is supported by the persuasive authority of the EPA's interpretation. *Id.* (citing EPA Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act (1987); EPA Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act (1993)). For these reasons, the court will compare the provisions under which DOH

action here was commenced to section 1319(g).

The DOH sent a notice under HRS § 342D–9(a)(1), specifying violations and requiring a response from Kukui. However, the notice itself clearly states that it is not a notice of impending penalties:

> You are to take appropriate action to prevent any further recurrence. Failure to do so *may lead to more stringent enforcement action* by the Department. Section 342D–11, H.R.S., provides for penalties of up to $10,000 per day for each violation.

Notice of Apparent Violation, attached as Exhibit "H" to Kiewit's Motion, at 2 (emphasis added). Such "more stringent" action could be initiated under HRS § 342D–9(a)(3), which provides that the director "[m]ay impose penalties under 342D–30 by sending a notice in writing, either by certified mail or by personal service, ...." There is thus no doubt that the notice sent by the DOH by regular mail was not a prerequisite to the commencement of an action for penalties and therefore will not be considered the commencement of such an action. Penalties were contemplated but not yet initiated, as indicated by the letter itself and by the form of service of the letter.

Defendants rely upon *Sierra Club v. Colorado Refining Co.* for their argument that the DOH's notice to Kukui constituted the commencement of an enforcement action under comparable state law. This court has already indicated above that *Colorado Refining* followed the approach of the *Scituate* court in its comparison of state enforcement to section 1319. The Ninth Circuit has criticized the *Scituate* court's departure from the plain statutory wording of section 1319(g), and has eschewed *Scituate*'s method of deferring to the state agency's enforcement plan wherever that agency has addressed the concerns of an analogous citizen's suit. *Wash. PIRG v. Pendleton Woolen Mills*, 11 F.3d at 885.

Relying in part on the reasoning in *Scituate*, the district court in *Colorado Refining* found that a state agency commenced an enforcement action under comparable state law when it served a "Notice of Significant Noncompliance" upon a discharger. 852

F.Supp. at 1485. The notice, served by certified mail, advised the discharger of permit violations, instructed it to provide a specific correction plan "before we pursue *further* action," and warned that penalties would "most likely" be imposed if it failed to do so. *Id.* The court relied upon the fact that, unlike a notice found not to commence an enforcement proceeding in *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc.,* 817 F.Supp. 1164, 1172 (D.N.J.1993), the notice in *Colorado Refining* was not "one of a periodic series."

The notice here resembles that in *Colorado Refining,* but this court will not apply the same analysis. The court in *Colorado Refining* held that a state action not yet seeking penalties could preclude the citizens' suit under Section 1319. For the reasons discussed above, this court finds that the State must seek penalties and not merely compliance in order for its action to have a preclusive effect. To hold otherwise would give state actions significantly more preclusive effect than EPA actions, a result supported by neither the language nor history of the statute. *Citizens,* 861 F.Supp. at 907. The commencement of an action for penalties is not signalled by a letter stating that penalties *may* be sought under a separate statutory section, particularly where, as here, the DOH has taken no further steps toward the imposition of penalties, its ambiguous comments to Plaintiffs notwithstanding.[12] Accordingly, the court DENIES Defendants' Motions for Summary Judgment on the issue of diligent prosecution.

B. *Comparability: Notice*

In a prior order addressing section 1319(g)(6)(A), this court found the notice and participation provisions of Hawaii law insufficiently comparable to section 1319(g) to bar a citizen's suit. *Save Our Bays and Beaches, et al. v. City and County of Honolulu,* Civil No. 92–00263 DAE (D.Hawaii 1994). Defendants argue that *Save Our Bays* did not take

into account certain statutory provisions and DOH rules, and that Plaintiffs have had actual notice and will have an opportunity to participate in the enforcement action. Because the court here finds that the DOH has not commenced an action for penalties, it need not revisit its conclusion in *Save Our Bays* regarding the notice and participation provisions of actions under Hawaii law.

III. Injunctive Relief

Plaintiffs agree with Defendants that any injunctive relief premised upon the failure of DOH to issue a NGPC is now moot. *See* Plaintiffs' Opposition, at 45. However, Plaintiffs disagree with Defendants that the issuance of the permit brings Defendants into compliance with the Clean Water Act, and they submit that for this reason the other grounds asserted for injunctive relief remain vital. Defendants respond that the undisputed evidence demonstrates that erosion control devices have been installed, bringing the project into compliance.

A citizen suit such as this may be dismissed because the defendant complies with the Act subsequent to the filing of the complaint. *Gwaltney,* 484 U.S. at 66, 108 S.Ct. at 386. In order to prove mootness, however, the defendant must show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* Where Defendants have permit coverage and are in complete compliance, the issue of injunctive relief may be moot.

Defendants rely upon the Affidavits of Ray Backen and John Schneider as factual support for the proposition that they are now in full compliance with permit requirements. Those affidavits state that erosion control measures have been taken in compliance with the plan submitted to the DOH. Plaintiffs dispute this fact in part on the record discussed in section I.C. above, and seek a continuance to complete discovery on the issue.

12. In a letter to counsel for Plaintiffs, the DOH stated that it would be issuing a formal "Notice and Finding of Violation and Order (NFVO)" to Kukui. *See* Letter, attached as Exhibit "14" to Plaintiffs' Joint Opposition to Defendants' Concise Statements. This July 8, 1994 letter indicated that the "exact scope of the NFVO is still under review." No NFVO has been issued as of the date of the hearing on these motions.

Federal Rule 56(f) allows the district court to grant a continuance when a party opposing summary judgment wishes to conduct further discovery. Fed.R.Civ.P. 56(f); *Allstate Ins. Co. v. Morgan*, 806 F.Supp. 1460, 1465–66 (N.D.Cal.1992). The party seeking discovery bears the burden of showing what specific facts it hopes to discover that will raise an issue of material fact. *Id.* at 1466 (citing *Harris v. Duty Free Shoppers Ltd. Partnership*, 940 F.2d 1272, 1276 (9th Cir.1991)). The decision to grant a continuance rests in the sound discretion of the district court, and should be granted where the opposing party shows that it could not, for the reasons stated, present facts essential to justify its opposition. *Id.*

Here, discovery in this matter will continue until July 31, 1995. Plaintiffs seek discovery regarding Defendants' compliance with the general permit. Where, as here, the Defendants bear a heavy burden of proving compliance and mootness, the court will not make a determination upon an incomplete record. In addition, as construction on the project has not yet begun again, Defendants have a particularly difficult task in demonstrating with absolute clarity that they will not again fail in their compliance. For these reasons, the court continues Defendants' Summary Judgment Motions on the issue of mootness at this time. The court notes that even if the claims for injunctive relief are found to be moot, the claims for civil penalties survive and create a continuing controversy. As this court has previously stated, "[i]n Clean Water Act cases, the mooting of injunctive relief does not moot a plaintiff's prayer for civil penalties and thus does not moot the case as a whole." *Save Our Bays and Beaches, et al. v. City and County of Honolulu*, Civil No. 92–00263 DAE (D.Hawaii 1994).[13]

---

**13.** Citing *Natural Resources Defense Council v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 503 (3d Cir.1993); *Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.*, 993 F.2d 1017, 1020–21 (2d Cir.1993) ("We hold . . . that a defendant's ability to show, after suit is filed but before judgment is entered, that it has come into compliance with limits on the dis-

*CONCLUSION*

For the reasons stated above, the court DENIES Defendants' Motions for Summary Judgment as they concern subject matter jurisdiction and diligent prosecution, and CONTINUES under Rule 56(f) Defendants' motions as they concern mootness until moved on by Defendants, but no sooner than sixty (60) days following the close of discovery.

IT IS SO ORDERED.

charge of pollutants will not render a citizen suit for civil penalties moot."); *Atlantic States Legal Foundation v. Tyson Foods, Inc.*, 897 F.2d 1128, 1135–36 (11th Cir.1990) (stating that "the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed.") (further citation omitted).